**John M. O'QUINN, Appellant,**

v.

**STATE BAR OF TEXAS, Appellee.**

**No. C–6790.**

Supreme Court of Texas.

Dec. 14, 1988.

Luther H. Soules, III, Law Offices of Luther H. Soules, III, San Antonio, Richard Haynes, Haynes & Fullenweider, T. Gerald Treece, Dean, South Texas College of Law, David Berg, Berg & Androphy, Stanley B. Binion, Baker, Brown, Sharman & Parker, James R. Leahy, Reynolds, Shannon, Miller, Blinn, White & Cook, Houston, for appellant.

Tom Alexander, Alexander & McEvily, Houston, Steven M. Smoot, First Asst. Gen. Counsel, Steven D. Peterson, State Bar of Texas, Jim Mattox, Atty. Gen., Javier P. Guajardo, Atty. General's Office, Austin, for appellee.

KILGARLIN, Justice.

This direct appeal, filed by John M. O'Quinn against the State Bar of Texas, is brought pursuant to Tex. Const. art. V, § 3–b, Tex. Gov't Code Ann. § 22.001(c) (Vernon 1988), and Tex.R.App.P. 140.[1] In response to the State Bar's disciplinary petition against him, attorney O'Quinn requested in district court a temporary and permanent injunction against prosecution of the action based on alleged federal and state constitutional deficiencies in the State Bar Act and certain disciplinary rules. The trial court denied O'Quinn's request for injunctive relief and, in its order, expressly found that the statute and rules complained of were constitutional, which serves as the basis for conferring direct appeal jurisdiction on this court. We now affirm the order denying injunctive relief and remand to the trial court for further proceedings.

On February 26, 1987, the State Bar filed its disciplinary action against O'Quinn pursuant to the State Bar Act, Tex.Rev.Civ. Stat.Ann. art. 320a–1 (repealed), and certain disciplinary rules promulgated by this court. (Effective September 1, 1987, the State Bar Act was codified as chapter 81 of the Texas Government Code.) To put the matter in context, we quote from the thus far unproved allegations against O'Quinn in the State Bar's disciplinary petition:

## II.

Various non-lawyers, including, but not limited to, Robert Loving, James C. McNeilley, Joe Coddington, Lloyd Donner, Terry Clark, and Gary Thomas, have at Respondent's behest recommended employment of Respondent to various potential clients who had not sought their or Respondent's advice regarding employment of an attorney. Some of such recommendations resulted in Respondent's employment and some did not. In instances where employment resulted, Respondent paid some of these non-lawyers sums of money for recommending

---

1. It will be noted that in the 1988 West Publishing Company's Texas Rules of Court there are two appellate rules denominated "140" (as there are also two rules 15a, 43, 47, 49, 54, 84, 85, 90, 133 and 182). The reason for this confusing situation is that the Supreme Court initially signed an order in March, 1987 amending the rules. The Court of Criminal Appeals concurred in those amendments. Then, on July 15, 1987, the Supreme Court issued a supplemental order, adopting many new amendments, but also changing some amendments, all to become effective January 1, 1988. Somehow, that order was never submitted to the Court of Criminal Appeals for its approval. Consequently, two versions appear in some instances. All of the dual rules are applicable to civil proceedings, and the Supreme Court version should be followed. For example, under the Court of Criminal Appeals version of Tex.R.App.P. 133, the Supreme Court would still be engaged in refusing writs, no reversible error, a practice we discontinued on January 1, 1988.

and securing such employments. Respondent also promised to pay and/or paid some of these non-lawyers a share of Respondent's fee in the cases. Such conduct violates Disciplinary Rules 1–102(A)(1)(2)(3)(6), 2–103(A)(C), and 3–102(A), and constitutes professional misconduct under State Bar Rules art. X, § 7(1)(5).

## ISSUE OF JURISDICTION

■ Before proceeding to the constitutional issues, we must address the State Bar's contention that this direct appeal should be dismissed for want of jurisdiction. Its principal argument is that the trial court did not deny injunctive relief "on the ground of the constitutionality of a statute of this state." Tex. Gov't Code Ann. § 22.001(c). According to the State Bar, disciplinary rules are not statutes because they are promulgated by this court pursuant to its inherent power to regulate the legal profession. *See* Tex. Gov't Code Ann. §§ 81.024, 81.071, 81.072. We have considered this argument but nonetheless conclude that our disciplinary rules should be treated like statutes. *See Touchy v. Houston Legal Found.*, 417 S.W.2d 625, 629 (Tex.Civ.App.—Waco 1967), *rev'd on other grounds*, 432 S.W.2d 690 (Tex.1968); *Cochran v. Cochran*, 333 S.W.2d 635, 640 (Tex.Civ.App.—Houston 1960, writ ref'd n.r.e.); *cf. Freeman v. Freeman*, 160 Tex. 148, 154, 327 S.W.2d 428, 433 (1959) (Texas Rules of Civil Procedure have the same force and effect as statutes). Having concluded that jurisdiction lies under Tex. Gov't Code Ann. § 22.001(c), we need not decide whether we would have jurisdiction under the "implied" and "inherent" powers derived from the Texas Constitution, as additionally urged by O'Quinn. We now proceed to the merits of the constitutional challenge.

## ISSUE ON APPEAL

Appellant O'Quinn brings a single point of error in our court, as follows:

The trial court erred in denying appellant's application for injunction by its failure to acknowledge that the State Bar Act, Tex.Civ.Stat.Ann. art. 320a–1 (1979) and certain State Bar Rules, Supreme Court of Texas, Rules Governing the State Bar of Texas art. X, § 7(1)(4)(5)(9) (1979), violate the Texas and United States constitutional rights to commercial free speech, equal protection of the laws, and open access to the courts.

We begin by emphasizing the narrowness of our review. The rule governing direct appeals to our court expressly recognizes that our jurisdiction is constitutionally confined "to questions of law only," and that a direct appeal to the supreme court "may present only the constitutionality of a statute of this State when the same shall have arisen by reason of the order of a trial court granting or denying an interlocutory or permanent injunction." Tex.R.App.P. 140(a), (b) (Vernon 1987 Special Pamph.). The same rule provided that "[i]f the case involves the determination of any contested issue of fact, *even though the contested evidence should be adduced as to constitutionality or unconstitutionality of a statute*, ... such an appeal will be dismissed." Tex.R.App.P. 140(c) (Vernon 1987 Special Pamph.) (emphasis added). Even as amended effective January 1, 1988, the clear language of Rule 140 prohibits us from adjudicating constitutional claims that would require additional factual development below. We assume O'Quinn and his counsel are familiar with the limitations of a direct appeal to our court. Consequently, we conclude that he has, for the purpose of this instant appeal, voluntarily waived any constitutional objections that would require fact findings in his favor. Otherwise, we would have no option but to dismiss the appeal.

## THE ARGUMENTS FOR AND AGAINST SOLICITATION

O'Quinn argues that it is unconstitutional for the State Bar to prosecute him for soliciting business through subsequently compensated intermediaries, or "runners," as the State Bar calls them. Citing actions by Abraham Lincoln and others, O'Quinn maintains that times have changed and so-

licitation should now be permitted. It is not enough, says O'Quinn, for the State Bar to argue that anti-solicitation rules protect the legal community from embarrassing, undignified behavior; further, O'Quinn contends that the ban against solicitation serves to prohibit competition among lawyers and is especially burdensome upon young lawyers or lawyers in smaller firms. O'Quinn also asserts that none of his clients have been harmed and none have complained. O'Quinn asks: why shouldn't attorneys be allowed to solicit business for pecuniary gain? Urging a so-called "retreat to reality," O'Quinn says we should break from tradition and allow lawyers to solicit business in-person or through intermediaries. This is especially true, O'Quinn argues, because accident victims are vulnerable to unscrupulous insurance adjusters.

The State Bar, joined by the Texas Trial Lawyers Association as an amicus curiae, counters that the potential for fraud and invasion of privacy supports a broad prohibition against in-person solicitation. The State Bar also points out that no one has control over a lawyer's "runners" and that the lawyer is not responsible for their actions or representations.

FEDERAL AND STATE FREE SPEECH

In *Bates v. State Bar of Arizona*, 433 U.S. 350, 383–84, 97 S.Ct. 2691, 2708–09, 53 L.Ed.2d 810 (1977), the Supreme Court held that advertising by attorneys may not be subjected to blanket suppression. However, the Court emphasized the narrowness of its ruling and expressly reserved the issue before us:

> [W]e also need not resolve the problems associated with in-person solicitation of clients—at the hospital room or the accident site, or in any other situation that breeds undue influence—by attorneys or their agents or "runners." Activity of that kind might well pose dangers of overreaching and misrepresentation not encountered in newspaper announcement advertising.

*Bates*, 433 U.S. at 366, 97 S.Ct. at 2700.

The Court answered part of the question so reserved in *Ohralik v. Ohio State Bar*

*Assn.*, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978), in which it squarely held that the state, or appropriate Bar authorities, "constitutionally may discipline a lawyer for soliciting clients in person, for pecuniary gain, under circumstances likely to pose dangers that the State has a right to prevent." *Id.* 436 U.S. at 449, 98 S.Ct. at 1915. *Ohralik* is the leading case addressing what is sufficiently misleading in the *manner* of advertising to permit restraint of an attorney's first amendment free speech rights. In *Ohralik*, the United States Supreme Court upheld a state's prophylactic rule prohibiting in-person solicitation by an attorney. *See id.* at 467, 98 S.Ct. at 1924. The Court noted that the manner of in-person solicitation was inherently conducive to overreaching and misconduct. *Id.* at 464, 98 S.Ct. at 1922. The Court reasoned that in-person solicitation (as opposed to printed advertisement) is still protected but at a lower level of judicial scrutiny of the restrictive legislation. *Id.* at 457, 98 S.Ct. at 1919. In distinguishing printed advertising from in-person solicitation, the court stated:

> Unlike a public advertisement, which simply provides information and leaves the recipient free to act upon it or not, in-person solicitation may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection. The aim and effect of in-person solicitation may be to provide a one-sided presentation and to encourage speedy and perhaps uninformed decision-making; there is no opportunity for intervention or counter-education by agencies of the Bar, supervisory authorities, or persons close to the solicited individual.

*Id.* In lowering the level of judicial scrutiny over legislation or rules addressing in-person solicitation, the court noted that the "immediacy of a particular communication and the imminence of harm are factors that have made certain communications less protected than others." *Id.* at n. 13.

Although *Ohralik* concerned solitation by the lawyer himself, the Court expressly

noted that "solicitation by a lawyer's agents or runners would present similar problems." *Id.* at 464 n. 22, 98 S.Ct. at 1923 n. 22. The concerns articulated in the Court's opinion justified the broad state rule prohibiting solicitation, and the Court specifically held that "the absence of explicit proof or findings of harm or injury is immaterial." *Id.* at 468, 98 S.Ct. at 1925. In our view, this latter quote answers O'Quinn's attempts to distinguish *Ohralik* on the facts, as well as his reliance on the fact that none of his clients have complained or been harmed. We also believe the Supreme Court has considered and rejected the "unscrupulous claims adjuster" argument, at least with respect to a lawyer's alleged right to solicit clients. *Id.* at 459 n. 16, 98 S.Ct. at 1920 n. 16 ("we are not unmindful of the problem of the related practice ... of the solicitation of releases of liability by claims agents or adjusters of prospective defendants or their insurers"). We, too, reject this argument. But, in so doing, we should not be construed as having approved of unconscionable conduct on the part of insurance adjusters. To the contrary, we condemn such unscrupulous practices. However, unless the adjuster is a lawyer or acts as an agent of a lawyer, the State Bar Disciplinary Rules are inapplicable. This does not mean that an adjuster's conduct cannot and should not be subject to scrutiny or sanctions.

At the heart of O'Quinn's constitutional contentions is the notion that the use of runners to solicit prospective clients is somehow deserving of more constitutional protection than the conduct considered in *Ohralik.* In support of this proffered distinction, O'Quinn recites lengthy passages from *Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985), a case involving a newspaper advertisement. Although *Zauderer* did place emphasis on the dangers of personal solicitation by a trained attorney, *id.* at 641–42, 105 S.Ct. at 2276–77, and recognized that in some instances in-person solicitation could be permissible, *id.* at 638, 105 S.Ct. at 2275, we perceive no retreat from the Court's prior observation that "solicitation by a lawyer's agents or runners would

present similar problems." *Ohralik,* 436 U.S. at 464 n. 22, 98 S.Ct. at 1923 n. 22.

O'Quinn also relies extensively on *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,* 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed. 2d 341 (1980), as establishing a four-part analysis to determine the constitutional validity of restrictions on commercial speech. We will assume, *arguendo,* that in-person solicitation by a lawyer's runners is deserving of some first amendment protection. *Cf. Ohralik,* 436 U.S. at 459, 98 S.Ct. at 1920 ("lawyer's procurement of remunerative employment is a subject only marginally affected with First Amendment concerns"). We further assume, and *Ohralik* holds, that the state has a strong and substantial interest in protecting the public from "overreaching and other forms of misconduct" as well as "invasions of the individual's privacy." 436 U.S. at 464, 465, 98 S.Ct. at 1922–23. Assuming further that *Central Hudson* requires us to "determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest," 447 U.S. at 566, 100 S.Ct. at 2351, we nevertheless conclude that a ban against in-person solicitation of clients by lawyers or runners is substantially related to legitimate state goals and could not be more narrowly tailored. The Supreme Court in *Ohralik* was keenly aware of the peculiar problems involved in trying to regulate private, in-person solicitation. 436 U.S. at 466–67 and n. 28, 98 S.Ct. at 1923–24 and n. 28 ("[n]o problem is more intractable than that of prescribing and enforcing standards with respect to in-person, private solicitation").

We further fail to see how O'Quinn takes any comfort from *State Bar Grievance Administrator v. Jaques,* 407 Mich. 26, 281 N.W.2d 469 (1979). Although the majority opinion in that case concluded that the discipline imposed against attorney Jaques could not stand after *Ohralik,* the court expressly noted: "There is no claim that the union official [whom Jaques solicited] was in fact nothing more than a 'runner' or agent for Jaques." *Id.* 407 Mich. at 38, 281

N.W.2d at 470. We likewise question O'Quinn's reliance on *Shapero v. Kentucky Bar Association,* — U.S. —, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988). That case involved targeted direct *mail* solicitation and does not implicate the concerns justifying prohibitions against in-person solicitation of business. Moreover, the Court goes so far as to suggest that states may categorically ban in-person solicitation. *Id.* at —, 108 S.Ct. at 1921, 100 L.Ed.2d at 483–84.

In sum, we hold that the State Bar's prosecution of the disciplinary action under review does not violate any of O'Quinn's free speech rights under the First and Fourteenth Amendments to the United States Constitution. But, that does not dispose of O'Quinn's argument that his free speech rights under the Texas Constitution have been violated.

The Texas Bill of Rights, Tex. Const. art. I, § 8, states in respect to free speech:

Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press.

We are of course "free to read [our] own constitution more broadly than [the Supreme] Court reads the Federal Constitution, or to reject the mode of analysis used by [the Supreme] Court in favor of a different analysis of its corresponding constitutional guarantee." *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 293, 102 S.Ct. 1070, 1077, 71 L.Ed.2d 152 (1982). This court has determined on several occasions that the Texas Bill of Rights affords protection beyond that provided by the United States Constitution. *See, e.g., LeCroy v. Hanlon,* 713 S.W.2d 335, 338 (Tex. 1986). One commentator has characterized Texas' free speech right as being broader than its federal equivalent, saying:

[V]arious states, like Texas, have broader free speech and assembly protections, which are often positively phrased as affirmative grants of rights rather than the simple restriction on government power observed in the first amendment

to the federal constitution. These more expansive guarantees, which are within a state's "sovereign right" as recognized by the federal Supreme Court, offer a significant distinction upon which courts rely to construe their state constitutions. J. Harrington, *The Texas Bill of Rights* 40 (1987).

Irrespective of whether the guarantee is in fact broader, it is quite obvious that the Texas Constitution's affirmative grant of free speech is more broadly worded than the first amendment's proscription of Congress from abridging freedom of speech. It is equally obvious that the framers of the first Texas Constitution were quite aware of the difference. The original draft of section 4 of the Declaration of Rights of the 1836 Constitution for the Republic of Texas provided: "No law shall ever be passed to curtail the liberty of speech or the press." 1 Gammel, Laws of Texas 868 (1898). But, by the time of its adoption the Fourth Declaration of Rights of the Texas Constitution of 1836 stated: "Every citizen shall be at liberty to speak, write, or publish his opinions on any subject, being responsible for the abuse of that privilege."

We need not decide at this time whether Texas' guarantee of free speech affords greater protection than its corresponding federal right, because neither analysis would permit the engagement of runners to solicit personally legal business. Even though in this case there may be no client complaint, in-person solicitation is fraught with the possibility of abuse, whether it be by one roaming the wards and rooms in an orthopedic wing of a hospital or by one imposing upon a widow during her time of grief. It is those abuses and others that the disciplinary rules are designed to prevent.

We have reviewed the Oregon cases cited by O'Quinn and find them unpersuasive. Although the free speech provision in the Oregon Constitution has language similar to its Texas counterpart, Oregon's highest court has held that obscenity, "under any definition," is protected by the Oregon Constitution. *State v. Henry,* 302 Or. 510, 525, 732 P.2d 9, 17 (1987). As explained by the

.

Supreme Court of Oregon, "[i]n this state any person can write, print, read, say, show or sell anything to a consenting adult even though that expression may be generally or universally considered 'obscene.'" *Id.* at 525, 732 P.2d at 18. We question whether a prohibition against disseminating obscene materials implicates a person's "liberty to speak, write or publish his opinions" within the meaning of Tex. Const. art. I, § 8, and we decline to follow in this context the Oregon decisions relied upon by O'Quinn. *See also Ackerley Communications, Inc. v. Multnomah County,* 72 Or.App. 617, 696 P.2d 1140 (1985), *petition withdrawn,* 303 Or. 165, 734 P.2d 885 (1987).

Again, a review of the allegations shows that O'Quinn is not being prosecuted for exercising any free speech right. Instead, the essential allegation is that he paid non-lawyers to solicit remunerative employment for himself. We further note that a person who, "with intent to obtain a benefit for himself ... procures another to solicit for him employment to prosecute a claim" is subject to criminal prosecution for barratry under Tex. Penal Code Ann. § 38.12(a)(4) (Vernon 1974). The Texas Court of Criminal Appeals has already rejected the contention that the barratry statute "is unconstitutional because it imposes a limitation on the right of free speech." *Barbee v. State,* 432 S.W.2d 78, 85 (Tex. Crim.App.1968), *cert. denied,* 395 U.S. 924, 89 S.Ct. 1779, 23 L.Ed.2d 241 (1969).

We decline to hold that the right of free speech under the Texas Constitution guarantees a lawyer the right to solicit business for pecuniary gain under the circumstances alleged in the State Bar's disciplinary petition. We do hold that prosecution of the State Bar's disciplinary action violates none of O'Quinn's rights under Tex. Const. art. I, § 8.

### STATE AND FEDERAL EQUAL PROTECTION

■ In his supplemental brief, O'Quinn urges "that the rules in question be declared violative of the state and federal constitutional equal protection provisions pursuant to *Whitworth v. Bynum,* 699

S.W.2d 194 (Tex.1985)." In *Whitworth,* our court joined a growing number of states which had struck down guest statutes on constitutional grounds. Refusing to indulge "a presumption that all automobile passengers suing a driver who is within the second degree of affinity or consanguinity do so collusively," we held "the Texas Automobile Guest Statute unconstitutional under Tex. Const. art. I, § 3, because the classifications drawn by this statute [were] not 'rationally related to a legitimate state interest.'" 699 S.W.2d at 197. It was not necessary for us "to address constitutional questions raised by the fourteenth amendment of the United States Constitution." *Id.*

For the reasons stated in our free speech analysis above, we believe a ban on in-person solicitation by lawyers and/or their runners is substantially related to legitimate state interests. Further, our research reveals (and O'Quinn has cited) no authority for striking down the rules in question on fourteenth amendment equal protection grounds. We overrule O'Quinn's state and federal equal protection challenges.

### OPEN COURTS UNDER THE TEXAS CONSTITUTION

■ O'Quinn argues he has standing to assert the constitutional rights of prospective clients "because it is difficult or impossible for them to independently raise the issue that their open courts rights have been maligned by the solicitation ban." O'Quinn relies on the following constitutional guarantee:

All courts shall be open, and every person for an injury done him, in his lands, goods, person, or reputation, shall have remedy by due course of law.

Tex. Const. art. I, § 13.

Even *assuming* O'Quinn has standing under the open courts provision, and accepting the premise that unscrupulous insurance adjusters sometimes take advantage of injured persons' lack of knowledge or experience, we find no open courts violation resulting from a ban on lawyer solicitation for pecuniary gain. The disciplinary

rules in question did not prohibit O'Quinn from informing injured persons "about their legal rights and the prospects of obtaining a monetary recovery, or from recommending that they obtain counsel." *Ohralik*, 436 U.S. at 458, 98 S.Ct. at 1919. They merely prevented him from accepting employment resulting from in-person solicitation by him or by his agents. We perceive no effective abrogation of victims' rights to bring any well-established common-law cause of action. *See Sax v. Votteler*, 648 S.W.2d 661, 665–66 (Tex.1983). We hold that the disciplinary rules prohibiting in-person solicitation by lawyers or their agents do not violate Tex. Const. art. I, § 13.

### CONCLUSION

One point, not raised, and as to which there has been no development of facts, troubles us. That concern is the concession made during oral argument by counsel for the State Bar that he knew of no instances of grievance prosecution of lawyers who make in-person solicitation of potential clients either personally or through agents, apart from plaintiffs' attorneys in personal injury litigation. Indeed, this selective prosecution seems to enjoy the sanction of the State Bar Rules. Disciplinary Rule 2–103(D)(1) only prohibits a lawyer from initiating contact with a prospective client if the lawyer knows or reasonably should know that the prospective client cannot exercise reasonable judgment in employing a lawyer.

Thus, solicitation of a casualty insurance company's claims manager might pass muster or the wining and dining of a corporate executive thinking of relocating his company in Texas could be arguably acceptable, even though the conduct in both instances amounts to "running cases." One need only read the occasional stories in newspaper business sections to be aware that sophisticated solicitation by law firms of corporate clients occurs more than infrequently. What one will not read in newspapers, however, but what allegedly exists, is monetary kickbacks to insurance claims managers or fee cutting in bidding wars to obtain corporate clients.

■ Without a development of facts by the trial court, however, this court cannot pass upon the question of whether the disciplinary rules are constitutionally infirm because of the apparent inequality in their enforcement. Nevertheless, if in-person solicitation of clients is an evil requiring prevention, the restriction should be applied to all lawyers irrespective of whether they litigate or never go to the courthouse, whether they represent plaintiffs or defendants, or whether the action sounds in tort or contract. The reason is that kickbacks and bidding battles are just as demeaning to the legal profession as unseemly solicitation of personal injury clients, even when no client, corporate or personal injury, complains.

We overrule all of O'Quinn's constitutional attacks before us and affirm the order of the trial court. This cause is remanded to that court for further proceedings.

PHILLIPS, C.J., and GONZALEZ, J., concur.

RAY, J., notes his dissent.

COOK, J., not sitting.

PHILLIPS, Chief Justice, concurring.

I join in all of the court's opinion except for the unfortunate dicta in the conclusion. Since the conduct condemned in that discussion is not before us, and has not been addressed by the parties, I see no benefit in offering our unsolicited thoughts in this area.

GONZALEZ, Justice, concurring.

I concur in the result reached by the Court but do not agree with its reasoning. We should have swiftly and summarily held that the trial court committed error in ruling on the constitutionality of the disciplinary rules because the trial court could have denied the injunction on other grounds. I am also concerned that by ruling on the constitutional claim asserted here by way of a request for injunctive relief, we have set a dangerous precedent

that will come back to haunt us. Other ingenious lawyers seeking to gain a postponement of a trial on the merits will buy time for their clients by merely seeking to enjoin the enforcement of the rules or law in question by simply alleging unconstitutionality. This manipulation of the process should not be allowed to parties who have an adequate remedy at law, such as O'Quinn does.

The Texas Trial Lawyers Association (TTLA), an association of attorneys who represent accident victims, filed an amicus brief with this court in support of vigorous enforcement of the State Bar rules prohibiting in-person solicitation. They assert that there is a growing problem in this State wherein a small group of attorneys send their "investigators" or "runners" to virtually every accident resulting in serious injury or death. There are reports of runners barging into hospital wards and/or funeral homes offering signing bonuses of $10,000 and more and/or offering to pay hospital or funeral expenses, in order to obtain the signature of a family member on a contingent fee contract. There are reports of runners impersonating priests and/or other clergy, as well as law enforcement officers who show up at the doorstep of a bereaved family with chauffered limousines ready to take the bereaved family to the office of the runner's attorney. Some families have been bombarded with competing claims by numerous runners, each touting the benefits of signing a contract with their employer. There are also reports of runners signing up accident victims on blank contracts which they shop around to attorneys for the highest bid.[1]

I do not in any way mean to imply or suggest that O'Quinn has engaged in any

of the misconduct which I have just described, but it serves in part to explain TTLA's concern for the problem and it also shows the context in which the State Bar brought its complaint against O'Quinn. The disciplinary complaint against O'Quinn *alleged* that O'Quinn had violated the State Bar disciplinary rules not only by paying non-lawyers sums of money for recommending and securing his employment by various potential clients, but also by agreeing with attorney Benton Musslewhite that he would "finance Musslewhite's law practice for and in consideration of the assignment of a portion of Musslewhite's attorney's fees to be earned in various cases in the future." The State Bar also charged that O'Quinn failed to respond to the State Bar's letter of inquiry and allegation regarding professional misconduct.

O'Quinn sought to prevent the State Bar from prosecuting him for these allegations. O'Quinn asserts that the State Bar Rules prohibiting such solicitation are unconstitutional and therefore, the Bar's prosecution of him should have been enjoined. The disciplinary rules claimed to be unconstitutional are DR 1–102(A)(1), (2), (3), and (6), 2–103(A) and (C), and 3–102(A). The trial court held that these rules are constitutional and denied an injunction. O'Quinn filed this direct appeal which has been pending in our court for the last year.

Generally, equitable relief is not available to enjoin the prosecution of a suit if the only basis for the injunctive relief is a matter that may be set up as a defense in the ensuing action. *Coker v. Logan*, 101 S.W.2d 284, 288 (Tex.Civ.App.—Amarillo 1937, writ ref'd). The exception lies where the movant can prove that he will suffer

1. As a result of the shameful conduct by brazen attorneys and runners who openly solicited business after the Delta #191 crash at the DFW Airport in August of 1985, the leadership of the State Bar became concerned that something had to be done. In consultation with and cooperation by TTLA, the Texas Association of Defense Counsel, and the Texas Insurance Board, the State Bar drafted and adopted a *Disaster Response Plan*. Under this plan, the President of the State Bar, the Chief Disciplinary Counsel, the Director of Communications and a representative of the State Board of Insurance go to

the site of a disaster within three hours after it occurs. Their sole function is to monitor compliance of the disciplinary rules. Hopefully, their presence on the scene will also keep the "predators" of whatever stripe away, whether they be runners for lawyers or insurance adjusters. Through an effective use of the media, the victims and their families are informed of their arrival and the location on the scene where they can lodge complaints against unscrupulous lawyers. This plan was put into effect after the crash of Delta #1141 in September of 1988. It appears to have been successful.

irreparable injury if he is denied injunctive relief. *Id.*

The subject of O'Quinn's request for injunctive relief is the constitutionality of the relevant disciplinary rules. O'Quinn could have raised, and in fact did raise, the constitutional challenge as a defense in the State Bar's suit against him. He did not, however, allege and prove special circumstances indicating irreparable injury would occur if denied the injunction. *See State v. Logue,* 376 S.W.2d 567, 572 (Tex.1964). Since the claim for injunctive relief could have been denied on this ground, the trial court should not have reached the constitutional issue.

"A court will not pass on the constitutionality of a statute if the particular case before it may be decided without doing so." *Baptist Hospital of Southeast Texas, Inc. v. Baber,* 714 S.W.2d 310 (Tex.1986); *San Antonio General Drivers, Helpers Local No. 657 v. Thornton,* 156 Tex. 641, 647, 299 S.W.2d 911, 915 (Tex.1957). The trial court in the instant case should have decided the request for injunctive relief without passing on the constitutional challenge. By not doing so, the trial court erroneously gave O'Quinn an avenue for direct appeal to this court.

I also disagree with the court's inclusion in its opinion of dicta regarding the State Bar's alleged selective prosecution for solicitation of plaintiffs' attorneys in personal injury litigation. Since O'Quinn did not plead that the disciplinary rules are constitutionally infirm because of alleged inequality and/or discriminatory enforcement, this observation or complaint by the court is more appropriate in a concurring opinion. Furthermore, this criticism is misdirected. We are the ones who promulgate the disciplinary rules for the State Bar and if there are problems with our rules, we have the power and the obligation to change them.

Moreover, the court misses the mark in comparing an attorney's "wining and dining" of a corporate executive to a runner's entreaties to a victim to retain the runner's employer. One purpose of the disciplinary rules prohibiting client solicitation is to prevent accident victims and others in emotional distress from being subjected to overreaching by an attorney. This purpose was recognized by the United States Supreme Court in *Ohralik v. State Bar Assn.,* 436 U.S. 447, 465, 98 S.Ct. 1912, 1923, 56 L.Ed. 2d 444 (1978). The Court noted there that the potential for overreaching is great "when a lawyer, a professional trained in the art of persuasion, personally solicits an unsophisticated, injured, or distressed lay person." *Id.* Few would have great concern that a corporate executive being "wined and dined" is in a state of emotional distress that requires that he or she be protected from an attorney's persuasiveness.

A second difference between corporate "wining and dining" and solicitation of victims of personal injury is the concern that the dignity of the profession and the dignity of the victim are eroded by uninvited approaches of lawyers and runners. The TTLA understood this concern in its amicus brief:

> When a wife who has just learned of her husband's death cannot even mourn her loss without being pursued by a pack of 'investigators' who are dispatched to scenes of tragedy to tout the services of lawyers, her dignity is eroded, her loss cheapened, her privacy trampled.

A corporate executive approached by a lawyer eager to be retained does not suffer the pain of intrusion that is suffered by a victim of personal injury who is approached at a time of vulnerability.

In summary, I concur in the court's judgment. The trial court was correct in denying the temporary injunction. The trial court, however, should not have reached the constitutional challenge because there existed an alternative basis for denying injunctive relief, i.e., no proof of irreparable injury and the existence of an adequate remedy at law.