Criminal Case Template







COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



MICHAEL CROSS,

                            Appellant,

v.

THE STATE OF TEXAS,

                            Appellee.

§

§

§

§

§

No. 08-03-00283-CR

Appeal from the

County Court at Law No. 1

of El Paso County, Texas

(TC#20000C06621)




MEMORANDUM OPINION
           In April 2000, Michael Cross attempted to collect signatures at an El Paso
shopping mall to have Pat Buchanan added to the ballot for the 2000 presidential election. 
 Mall officials asked Cross to leave, and when he refused to do so, they called the police. 
Cross was subsequently arrested and convicted for criminal trespass and was assessed a
$500 fine. Cross appeals, contending that the application of the criminal trespass statute
in this case violates his right to free speech under the United States and Texas
Constitutions. We conclude that Cross’s federal constitutional claim has been foreclosed
by decisions of the United States Supreme Court and that Cross has not demonstrated why
we should interpret the Texas Constitution more broadly than the Unites States
Constitution in this regard. Accordingly, we will affirm the judgment of the trial court.
Factual and Procedural Background
           The facts in this case are essentially undisputed. Sunland Park Mall is a 950,000-square-foot enclosed shopping center with movie theaters and over one-hundred stores
grouped around a common area and surrounded by a large parking lot. There are only
three large malls in El Paso, and Sunland Park is the only one on the west side of town. 
Some department stores have their only west-side location at Sunland Park.
           The Mall and its parking lot are open to the general public during business hours. 
But the Mall does not allow people to put handbills on vehicles parked in the lot. The
Mall allows a number of noncommercial activities on the premises and it does not require
those who enter the Mall to shop. For example, people may sit in the food court without
purchasing food, walk the common area for exercise, or attend free organ concerts. The
Mall also allows various organizations to use the common area. To take advantage of this
opportunity, an organization must complete a common-area application and obtain
approval from Mall management. The application form states that the Mall retains sole
discretion to permit or not permit any person or organization to use the common area. 
The Mall’s marketing director, Sylvia Hernandez, testified that the purpose of the Mall is
to “make money.” Therefore, in considering whether to grant an application, the Mall
considers whether the proposed activity will increase traffic flow into the Mall, whether it
will enhance the image of the Mall, and whether it will offend the Mall’s customers or
tenants. Based upon these considerations, the Mall does not grant common-area
applications for partisan political activities. For example, the Mall refused an application
by the El Paso Jaycees to solicit signatures regarding a bond issue because the Mall did
not want to give the appearance of having “taken a side” on the issue. But the Mall
granted an application to set up early voting booths in the common area because that
activity was not partisan and because the Mall hoped that some of the voters would stay to
shop after voting.
           Before the day that he was arrested, Cross attempted to solicit signatures for his
petition at the Mall. When he was stopped by the Mall’s security guards, he went to the
Mall office and was told that he had to complete a common-area application before
conducting his activities at the Mall. Cross refused to complete and submit an
application. Hernandez and the Mall’s manager, Connie Warner, testified that even if
Cross had submitted an application, it would have been turned down because of the
political nature of his activities.
           The following Saturday, Cross positioned himself at one of the Mall’s main
entrances and approached shoppers as they entered the Mall. Warner testified that some
Mall patrons were offended by Cross and reported his activities to the Mall’s
management; others simply ignored him. Hernandez and a Mall security guard informed
Cross that he did not have permission to conduct his activities at the Mall and that he
would have to leave. When Cross refused to leave, Hernandez called the police. Upon
their arrival, the police again asked Cross to leave the Mall premises, and he again
refused. At that point, he was placed under arrest for criminal trespass.



           Cross filed a pretrial petition for writ of habeas corpus, asserting that the criminal
trespass statute was being unconstitutionally applied in this case. Ex parte Cross, 69
S.W.3d 810, 813 (Tex. App.--El Paso 2002, no pet.). The trial court denied the petition
after conducting an evidentiary hearing. Id. Cross then appealed to this Court. 
Concluding that Cross’s “as applied” challenge to the statute was not ripe because he had
not yet been convicted, we dismissed the appeal. Id. at 814-15.
           Back in the trial court, the parties stipulated that the evidence at trial would be the
same as the evidence at the habeas hearing and they requested the judge (who had
presided at the habeas hearing) to take judicial notice of the evidence at that hearing. 
Cross again argued that application of the criminal trespass statute was unconstitutional in
this case. The court adhered to its previous ruling on that argument and found Cross
guilty of the offense.
United States Constitution
           In his first issue, Cross asserts that the criminal trespass statute, as applied in this
case, violates the First Amendment to the United States Constitution. Specifically, he
argues that he was entitled to exercise his right to free speech at Sunland Park Mall
because the Mall is the functional equivalent of a town square.
           The First Amendment generally forbids content-based restrictions on free speech. 
See Hudgens v. Nat’l Labor Relations Bd., 424 U.S. 507, 520, 96 S.Ct. 1029, 1036, 47
L.Ed.2d 196 (1976). But it is also axiomatic that the First Amendment only forbids
abridgment of speech by the government. Id. at 513, 96 S.Ct. at 1033. The United States
Supreme Court recognized a narrow exception to this second axiom in Marsh v. Alabama.
           In Marsh, a Jehovah’s Witness was convicted of criminal trespass for distributing
religious literature on a sidewalk in a town that was wholly owned by a private
corporation. 326 U.S. 501, 502-04, 66 S.Ct. 276, 277, 90 L.Ed. 265 (1946). The town
had all the characteristics of an ordinary town, including residences, a business block,
sewers, and a post office. Id. at 502-03, 66 S.Ct. at 277. The Court noted that
distribution of the literature on a public sidewalk would obviously have been protected by
the First Amendment. Id. at 504-05, 66 S.Ct. at 277-78. The Court then held that “the
circumstance that the property rights to the premises where the deprivation of liberty . . . 
took place, were held by others than the public, is not sufficient to justify the State’s
permitting a corporation to govern a community of citizens so as to restrict their
fundamental liberties . . . .” Id. at 509-10, 66 S.Ct. at 280. Furthermore, the State’s
enforcement of that restriction through its criminal trespass statute could not stand. Id.,
66 S.Ct. at 280.
           The Court extended Marsh in Amalgamated Food Employees Union Local 590 v.
Logan Valley Plaza, Inc., 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968). In that
case, a state court issued an injunction prohibiting union members from picketing a store
at a shopping center. Logan Valley, 391 U.S. at 312-13, 88 S.Ct. at 1605. As in Marsh,
the Court noted that the picketing would have been protected by the First Amendment if it
had occurred on a public sidewalk. Id. at 315, 88 S.Ct. at 1607. The Court also believed
that the shopping center was the “functional equivalent of the business district . . .
involved in Marsh.” Id. at 318, 88 S.Ct. at 1608. The Court concluded that “because the
shopping center serves as the community business block ‘and is freely accessible and
open to the people in the area and those passing through,’ . . . the State may not delegate
the power, through the use of its trespass laws, wholly to exclude those members of the
public wishing to exercise their First Amendment rights on the premises in a manner and
for a purpose generally consonant with the use to which the property is actually put.” Id.
at 319-20, 88 S.Ct. at 1609 (quoting Marsh, 326 U.S. at 508, 66 S.Ct. at 279).
           Four years later, the Court retreated from Logan Valley in Lloyd Corp. v. Tanner, 
407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972), a case we will discuss in some detail
because of its factual similarities to this case. Lloyd involved an attempt by anti-war
protesters to distribute handbills at a mall that covered approximately fifty acres and had
sixty tenants, including several department stores. 407 U.S. at 553, 556, 92 S.Ct. at 2221-22. The mall was generally open to the public and made a “considerable effort” to attract
shoppers and to create community goodwill. Id. at 555, 92 S.Ct. at 2222. To this end,
some civic and charitable organizations were permitted, “by invitation and advance
arrangement,” to use mall facilities. Id., 92 S.Ct. at 2222. The mall did not allow
organizations to use the mall for political purposes, except that presidential candidates of
both parties were allowed to speak in the hope that people who came to hear the
candidates would shop before leaving the mall. Id. at 555 & n.3, 92 S.Ct. at 2222 & n.3. 
The mall also prohibited the distribution of handbills because that activity might annoy
customers and was incompatible with the mall’s purpose. Id. at 555-56, 92 S.Ct. at 2222.
The mall employed security guards, who were commissioned by the city, had police
authority within the mall, wore uniforms similar to those worn by city police, and were
licensed to carry handguns. Id. at 554, 92 S.Ct. at 2222.
           Under these facts, the Court held that the protesters did not have a First
Amendment right to distribute their handbills at the mall. Id. at 570, 92 S.Ct. at 2229. 
The Court distinguished Logan Valley on two grounds. First, the free-speech activities in
Logan Valley were targeted at a store in the shopping center, rather than at the public at
large. Second, the targeted store in Logan Valley was located within a large private
enclave, leaving the picketers with no other reasonable opportunities to convey their
message to its intended audience, whereas the Lloyd mall was crossed by public streets
and sidewalks. Id. at 563-64, 566-67, 92 S.Ct. at 2226-28. The Court distinguished
Marsh on the ground that it involved “the assumption by a private enterprise of all of the
attributes of a state-created municipality and the exercise by that enterprise of semiofficial
municipal functions as a delegate of the State. In effect, the owner of the company town
was performing the full spectrum of municipal powers and stood in the shoes of the
State.” Id. at 569, 92 S.Ct. at 2229.
           The Court acknowledged that the mall was generally open to the public and that it
had been used for various noncommercial activities. But the mall was open to the public
for the purpose of doing business and the noncommercial activities were allowed for the
purpose of bringing in potential shoppers. Id. at 564-65, 92 S.Ct. at 2227. The Court also
emphasized:
[T]he First and Fourteenth Amendments safeguard the rights of free speech
and assembly by limitations on state action, not on action by the owner of
private property used nondiscriminatorily for private purposes only. . . . .
 
Although . . . the courts properly have shown a special solicitude for
the guarantees of the First Amendment, this Court has never held that a
trespasser or an uninvited guest may exercise general rights of free speech
on property privately owned and used nondiscriminatorily for private
purposes only.

Id. at 567-68, 92 S.Ct. at 2228.

           Although the Lloyd Court attempted to distinguish, rather than overrule, Logan
Valley, the Court later made plain that Logan Valley is no longer good law. In Hudgens,
the Court stated that “the reasoning . . . in Lloyd cannot be squared with the reasoning . . .
in Logan Valley” and that “the rationale of Logan Valley did not survive the Court’s
decision in the Lloyd case.” 424 U.S. at 518, 96 S.Ct. at 1035-36. Hudgens involved an
attempt by striking union members to picket in an enclosed mall. Id. at 509, 96 S.Ct. at
1031. The Court held that since the anti-war protesters in Lloyd did not have a First
Amendment right to distribute their handbills in a mall, the picketers likewise did not
have a First Amendment right to advertise their strike in the mall. Id. at 520-21, 96 S.Ct.
at 1037.
           From reviewing these decisions, it is apparent that the First Amendment guarantee
of free speech does not apply in a privately owned shopping mall. See PruneYard
Shopping Ctr. v. Robins, 447 U.S. 74, 81, 100 S.Ct. 2035, 2040, 64 L.Ed.2d 741 (1980)
(acknowledging that Logan Valley has been overruled); Gibbons v. State, 775 S.W.2d
790, 793 (Tex. App.--Dallas 1989), pet. ref’d, 815 S.W.2d 739 (Tex. Crim. App. 1991)
(stating that the federal constitutional guarantee of free speech is not applicable to a
privately owned shopping center); see also United States v. Kokinda, 497 U.S. 720, 725,
110 S.Ct. 3115, 3119, 111 L.Ed.2d 571 (1990) (noting that a private business enjoys
absolute freedom from First Amendment constraints).
           Given the Supreme Court’s pronouncements in Lloyd and Hudgens, and Lloyd’s
factual similarities to this case, it would appear that Cross had no First Amendment right
to solicit signatures at Sunland Park Mall.


 Cross argues, however, that Lloyd is
distinguishable from this case because it did not involve a criminal prosecution for
trespass.
           Cross does not explain how this distinction makes a difference. Judicial
enforcement of neutral trespass laws generally does not amount to state action. 
CompuServe Inc. v. Cyber Promotions, Inc., 962 F.Supp. 1015, 1026 (S.D. Ohio 1997)
(citing Rotunda & Nowak, Treatise on Constitutional Law § 16.3, at 546 (West
1992)); People v. DiGuida, 604 N.E.2d 336, 345-46 (Ill. 1992); City of Sunnyside v.
Lopez, 751 P.2d 313, 319 (Wash. Ct. App. 1988). Two of our sister appellate courts have
applied Lloyd to criminal-trespass prosecutions. See Zarsky v. State, 827 S.W.2d 408,
410-11 (Tex. App.--Corpus Christi 1992, pet. ref’d); Gibbons, 775 S.W.2d at 791, 793. 
Moreover, the Court stated in Lloyd that it had “never held that a trespasser . . . may
exercise general rights of free speech on property privately owned and used
nondiscriminatorily for private purposes only.” 407 U.S. at 568, 92 S.Ct. at 2228.
           Cross’s first issue is overruled.
Texas Constitution
           In his second and third issues, Cross asserts that the criminal trespass statute, as
applied in this case, violates the Texas Constitution’s guarantees of free speech and
assembly. See Tex. Const. art. I, §§ 8, 27.



           After the United States Supreme Court’s decisions in Lloyd and Hudgens, the
California Supreme Court held that the solicitation of petition signatures at a shopping
center is an activity protected by the California Constitution. Robins v. PruneYard
Shopping Ctr., 592 P.2d 341, 342 (Cal. 1979), aff’d, 447 U.S. 74, 100 S.Ct. 2035, 64
L.Ed.2d 741 (1980). The United States Supreme Court affirmed the California Supreme
Court’s decision, stating, “Lloyd . . . does not . . . limit the authority of the State to
exercise its police power or its sovereign right to adopt in its own Constitution individual
liberties more expansive than those conferred by the Federal Constitution.” PruneYard,
447 U.S. at 81, 100 S.Ct. at 2040.
           Following California’s lead, a few states have concluded that the free-speech
provisions in their own constitutions protect speech at shopping centers. See, e.g., Bock v.
Westminster Mall Co., 819 P.2d 55, 56 (Colo. 1991); New Jersey Coalition Against War
v. J.M.B. Realty Corp., 650 A.2d 757, 760 (N.J. 1994). But most courts that have
considered the question have declined the Supreme Court’s invitation to interpret their
state constitutions more broadly in this regard. See, e.g., Fiesta Mall Venture v. Mecham
Recall Comm., 767 P.2d 719, 724 (Ariz. Ct. App. 1989); Cologne v. Westfarms Assocs.,
469 A.2d 1201, 1202 (Conn. 1984); Cahill v. Cobb Place Assocs. 519 S.E.2d 449, 450-451 (Ga. 1999); Estes v. Kapiolani Women’s & Children’s Med. Ctr., 787 P.2d 216, 221
(Haw. 1990); DiGuida, 604 N.E.2d at 347; State v. Lacey, 465 N.W.2d 537, 540 (Iowa
1991); Woodland v. Michigan Citizens Lobby, 378 N.W.2d 337, 338-39 (Mich. 1985);
State v. Wicklund, 589 N.W.2d 793, 803 (Minn. 1999); State v. Felmet, 273 S.E.2d 708,
712 (N.C. 1981); S.O.C., Inc. v. Mirage Casino-Hotel, 23 P.3d 243, 250 (Nev. 2001)
(plurality opinion); SHAD Alliance v. Smith Haven Mall, 488 N.E.2d 1211, 1214 (N.Y.
1985); Eastwood Mall, Inc. v. Slanco, 626 N.E.2d 59, 61-62 (Ohio 1994); Charleston
Joint Venture v. McPherson, 417 S.E.2d 544, 548 n.7 (S.C. 1992); Southcenter Joint
Venture v. Nat’l Democratic Policy Comm., 780 P.2d 1282, 1292 (Wash. 1989); Jacobs v.
Major, 407 N.W.2d 832, 847 (Wis. 1987).
           There is no reported case addressing whether the free-speech provision of the
Texas Constitution protects speech at a shopping mall. But see Republican Party of
Texas v. Dietz, 940 S.W.2d 86, 90 n.5 (Tex. 1997) (acknowledging the split in authority
on this issue); but cf. Zarsky, 827 S.W.2d at 411-12 (holding that the Texas free-speech
provision did not protect protesting outside an abortion clinic at an office complex);
Gibbons, 775 S.W.2d at 791, 793-94 (holding that the Texas free-speech provision did
not protect protesting in a street owned by a church); Right to Life Advocates, Inc. v.
Aaron Women’s Clinic, 737 S.W.2d 564, 567-69 (Tex. App.--Houston [14th Dist.] 1987,
writ denied) (plurality opinion) (applying a balancing test to determine whether right to
free speech applies on private property). Nevertheless, we are not without guidance in
resolving this issue.
           The Texas Court of Criminal Appeals has made clear that although the Texas
Constitution may be interpreted differently than the United States Constitution, courts are
not free to impose their own notions of fairness upon Texas citizens as a matter of state
constitutional law without firm support in state history or policy. Cobb v. State, 85
S.W.3d 258, 267-68 (Tex. Crim. App. 2002), cert. denied, 537 U.S. 1195, 123 S.Ct. 1256,
154 L.Ed.2d 1032 (2003). In construing a provision of the Texas Constitution, we may
consider the text of the provision, the provision’s history, the framers’ intent, public
policy, and the construction of similar provisions by federal and state courts. See State v.
Ibarra, 953 S.W.2d 242, 244 (Tex. Crim. App. 1997). The party arguing that a provision
of the Texas Constitution should be interpreted more broadly than its federal counterpart
bears the burden of showing the inappropriateness of the federal interpretation. See
Cobb, 85 S.W.3d at 267.
           Similarly, the Texas Supreme Court has stated:
It is possible that [the Texas free-speech provision] may be more
protective of speech in some instances than the First Amendment, but if it
is, it must be because of the text, history, and purpose of the provision, not
just simply because. Starting from the premise that the state constitutional
provision must be more protective than its federal counterpart illegitimizes
any effort to determine state constitutional standards. To define the
protections of Article I, Section 8 simply as one notch above First
Amendment protections is to deny state constitutional guarantees any
principled moorings whatever. We reject this approach.

Operation Rescue-Nat’l v. Planned Parenthood, 975 S.W.2d 546, 559 (Tex. 1998).



 

           The Texas Constitution provides:
Every person shall be at liberty to speak, write or publish his
opinions on any subject, being responsible for the abuse of that privilege;
and no law shall ever be passed curtailing the liberty of speech or of the
press. In prosecutions for the publication of papers, investigating the
conduct of officers, or men in public capacity, or when the matter published
is proper for public information, the truth thereof may be given in evidence. 
And in all indictments for libels, the jury shall have the right to determine
the law and the facts, under the direction of the court, as in other cases.

Tex. Const. art. I, § 8. Cross argues that the language of article I, section 8 is broader
than the First Amendment. He also points out that the language of this provision is
similar to the free-speech provision in the California Constitution, which the California
Supreme Court has construed to protect the type of activity at issue in this case. See
Robins, 592 P.2d at 342. Additionally, Cross argues that public policy supports the result
he seeks.
           The Texas Supreme Court has indicated that in some ways article I, section 8
provides a broader guarantee of free speech than the First Amendment. See, e.g.,
Davenport v. Garcia, 834 S.W.2d 4, 7-9 (Tex. 1992); O’Quinn v. State Bar of Texas, 763
S.W.2d 397, 402 (Tex. 1988). But see Operation Rescue, 975 S.W.2d at 559 (noting that
article I, section 8 may be more protective of speech than the First Amendment in some
instances, but finding nothing in its text, history, or purposes to suggest that injunctions
restricting speech should be judged by a different standard under the Texas Constitution
than under the First Amendment). This determination is based on section 8’s first clause,
which is phrased as an affirmative grant of the right to speak rather than as a restriction
on governmental interference with speech. Davenport, 834 S.W.2d at 7-8; O’Quinn, 763
S.W.2d at 402. But see Charles W. “Rocky” Rhodes, A Proposal for Interpreting
Corresponding United States and Texas Constitutional Guarantees in the New Millenium,
51 Baylor L. Rev. 269, 284-86 (1999) (questioning whether the language of the entire
section demonstrates an intent to provide a broader guarantee).
           Although Cross relies on the first sentence of section 8, he does not articulate how
or why the language and history of that sentence demonstrate an intent to protect speech
on private property. It has been suggested that the language of the first sentence of
section 8 is concerned with government regulation of speech. See Ex parte Tucci, 859
S.W.2d 1, 19 (Tex. 1993) (Phillips, C.J., concurring) (“The language derives from the
eighteenth century right at English common law to publish books and pamphlets without
prior government approval.”); see also SHAD Alliance, 488 N.E.2d at 1214 n.4
(suggesting that similar language in the New York Constitution was aimed at curbing
legislation concerning defamation).
           Moreover, the Texas Supreme Court has held that state action is required before a
person may maintain a claim for violation of article I, section 8. Dietz, 940 S.W.2d at 91. 
Generally, state action is only present for otherwise private conduct when the conduct can
be fairly attributed to the government. Id. There is no evidence to show that the
operations of Sunland Park Mall could be fairly attributed to the government. But see
Golden Gateway Ctr. v. Golden Gateway Tenants Ass’n, 29 P.3d 797, 810 (Cal. 2001)
(holding that the actions of a private property owner constitute state action if the property
is freely and openly accessible to the public). And, as we have already noted, judicial
enforcement of neutral trespass laws generally does not amount to state action. 
CompuServe, 962 F. Supp. at 1026; DiGuida, 604 N.E.2d at 345-46; Lopez, 751 P.2d at
319.
           The California Supreme Court’s decision in Robins v. PruneYard does not
convince us that article I, section 8 protects speech at a shopping mall. Although the
California free-speech provision is similar to that of Texas, the California Supreme Court
did not rest its decision on an examination of the text or history of the provision. See
Robins, 592 P.2d at 346-47; see also SHAD Alliance, 488 N.E.2d at 1214 n.5 (noting that
the Robins Court summarily stated its conclusion without analyzing the constitutional
provision at issue); Jacobs, 407 N.W.2d at 841 (same). Therefore, Robins does not assist
us in interpreting article I, section 8. Furthermore, as the California Supreme Court has
acknowledged, most states with similar constitutional provisions have declined to follow
Robins. Golden Gateway, 29 P.3d at 801-02.
           Finally, Cross relies on “demographic and sociological changes.” He points out
that when Lloyd was written--over thirty years ago--the Court considered large shopping
malls to be a relatively new concept in shopping center design. See Lloyd, 407 U.S. at
553, 92 S.Ct. at 2221. Now, according to Cross, “it is widely accepted that the downtown
areas of many large urban cities are functionally dead and the suburban or outlying
shopping mall fulfills many of the purposes and is used by citizens for pursuits which
formerly would have been carried on in the town square or downtown.”
           The record contains no evidence to support Cross’s assertion that the downtowns
of the United States or Texas in general, or of El Paso in particular, are functionally dead. 
Nor is there any evidence to suggest an absence of public spaces where Cross could have
solicited signatures. In dismissing Cross’s habeas appeal, we stated:
[T]he gravamen of Cross’s . . . argument [is] that the Mall has become the
functional equivalent of the town square such that his First Amendment
right to free political speech is protected on otherwise private property. In
both his briefing and at oral argument, Cross attempted to support this
conclusion by arguing that sociological changes to the nature of public
space in American society have occurred. However there was no
testimonial or documentary evidence to substantiate this contention. 
Whether such evidence will be adduced during the trial on the merits is of
course up to the parties but its present absence further reinforces our
conclusion that this case is not ripe for adjudication.

Cross, 69 S.W.3d at 815. Despite these statements, Cross elected to rely on the habeas
record at the trial on the merits.
           Cross has not demonstrated that his broad interpretation of article I, section 8 is
supported by its text, history, or purpose. Accordingly, based on the facts and arguments
presented here, we cannot conclude that the criminal trespass statute violates article I,
section 8 as applied in this case.
           Cross’s second and third issues are overruled.
 

Conclusion
           For the reasons stated herein, the judgment of the trial court is affirmed.
 
                                                                  SUSAN LARSEN, Justice
July 8, 2004

Before Panel No. 1
Larsen, McClure, and Chew, JJ.
Chew, J., dissenting

(Do Not Publish)


DISSENTING OPINION

           I disagree with several conclusions reached in the majority’s opinion, therefore I
respectfully dissent.
           Michael Cross was arrested at the Sunland Park Mall in El Paso while attempting
to collect signatures in support of a candidate for the 2000 presidential election. Mr.
Cross was convicted of criminal trespass and in the trial court he challenged the
constitutionality of the trespass statute as applied to him. On appeal, Mr. Cross contends
that the application of the criminal trespass statute in this case violates his right to free
speech under the federal and Texas constitutions.
           While it is evident that the Supreme Court’s decision in Lloyd Corp. v. Tanner
effectively forecloses any federal guarantee of free speech in a privately-owned shopping
mall, the Texas Constitution’s affirmative grant of free speech should be interpreted to
afford its citizens broader protections than its federal counterpart under these
circumstances. This state’s guarantee of free speech provides in pertinent part:
Every person shall be at liberty to speak, write or publish his opinions on any
subject, being responsible for the abuse of that privilege; and no law shall ever be
passed curtailing the liberty of speech or of the press. . . . Tex.Const. art. 1, § 8.
 
In Davenport v. Garcia, the Texas Supreme Court recognized that over the course of our
constitutional history, Texas has specifically guaranteed an affirmative right to speak and
included its expansive freedom of expression clause in its 1836, 1861, 1866, 1869 and
1876 constitutions. Davenport v. Garcia, 834 S.W.2d 4, 7-9 (Tex. 1992). The Davenport
Court also acknowledged that Texas’ free speech provision is broader than the First
Amendment in some aspects. Id. at 8; see O’Quinn v. State Bar of Texas, 763 S.W.2d
397, 402 (Tex. 1988) (Texas Constitution’s affirmative grant of free speech is more
broadly worded than the First Amendment). See also PruneYard Shopping Center v.
Robins, 447 U.S. 74, 80-81, 100 S.Ct. 2035, 2040, 64 L.Ed.2d 741 (1980) (state’s
constitution may provide more expansive individual liberties than those conferred by the
federal constitution). Even though there is nothing in our constitutional text that
explicitly limits the free speech protection to violations by state actors, the Texas
Supreme Court has held state action is required to trigger protection of our guaranteed
expressional rights. See The Republican Party of Texas v. Dietz, 940 S.W.2d 86, 95 (Tex.
1997) (majority’s reliance on federal state action doctrine in interpreting the Texas
Constitution is misplaced) (Spector, J., concurring).
           While our free speech provision has been interpreted in such a way as not to reach
any private action, the quasi-public character of large shopping malls in modern America
raises a serious concern that expressional rights are being denied in locales that private
owners have intentionally transformed into the functional equivalent or replacement of
traditional public squares or gathering places. See New Jersey Coalition Against War in
the Middle East v. J.M.B. Realty, 650 A.2d 757, 780 (N.J. 1994) (mall owners who have
so transformed the life of society for their profit should not be permitted to claim a
theoretically-important right of silence from the multitudes they have invited). Sunland
Park is a 950,000 square-foot facility, containing over one hundred stores. Sunland Park
permits a number of noncommercial activities on its premises and implicitly invites the
public to enter and use its space--without requiring them to shop. However, it refuses to
permit partisan political activities. After appropriating the characteristics and purposes of
a traditional public forum by inviting the general public to make use of its space for
noncommercial activities, owners of large shopping malls like Sunland Park should not
be permitted to later deny the full consequences of their open invitation. Free expression
of political ideas and political discourse is a central component to the traditional public
forum and should remain so, despite its change of location to the mall.
           For these reasons, I respectfully dissent.

                                                                  DAVID WELLINGTON CHEW, Justice
July 8, 2004