# Supreme Court of Texas

No. 23-0694

Brent Edward Webster,

*Petitioner*,

v.

Commission for Lawyer Discipline,

*Respondent*

On Petition for Review from the
Court of Appeals for the Eighth District of Texas

**Argued September 12, 2024**

JUSTICE YOUNG delivered the opinion of the Court, in which Chief Justice Hecht, Justice Devine, Justice Blacklock, Justice Busby, Justice Bland, and Justice Huddle joined.

JUSTICE BOYD filed a dissenting opinion, in which Justice Lehrmann joined.

In the aftermath of the 2020 presidential election, the State of Texas moved for leave to invoke the U.S. Supreme Court's original jurisdiction to sue four other states. Attorney General Ken Paxton was the counsel of record, and Brent Webster, the attorney general's first assistant, appeared on the initial pleadings. An individual with no connection to the underlying litigation filed a grievance with the

1

Commission for Lawyer Discipline, alleging that Webster's participation violated Texas Disciplinary Rule of Professional Conduct 8.04(a)(3). That rule prohibits lawyers from "engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation." The commission ultimately agreed, identifying six statements in the initial pleadings that, it contends, violate the rule. It filed a lawsuit seeking to hold Webster to account for those statements. The district court dismissed the case on the ground that exercising jurisdiction over the commission's lawsuit would violate the Texas Constitution's separation-of-powers doctrine. The court of appeals reversed. We agree with the district court and reinstate its judgment of dismissal.

Generally, scrutiny of statements made directly to a court within litigation is by the court to whom those statements are made. Such a court has substantial authority and many tools to address alleged violations of professional disciplinary (and other) rules, which apply to all Texas lawyers, including the attorney general and his staff. Lawyers who submit to a court's jurisdiction subject themselves to that court's authority to compel adherence to the highest standards of professional conduct.

But this case involves no such direct scrutiny. The U.S. Supreme Court neither imposed discipline on the first assistant nor referred him (or anyone else) to the commission (or any disciplinary body). Rather, the commission's lawsuit arose from outside the litigation in which the challenged statements were made. We doubt that its collateral use of Rule 8.04(a)(3)—as opposed to direct review by the court to whom the statements are made—is a proper way to scrutinize the contents of initial pleadings of any attorney. What makes this case different from ordinary

2

litigation, though, is its constitutional dimension. By second-guessing the contents of initial pleadings filed on behalf of the State of Texas, under the attorney general's authority, the commission has intruded into terrain that this Court's precedent has described as belonging to the attorney general.

Specifically, the Texas Constitution endows the attorney general (and at his direction, his first assistant) with the authority both to file petitions in court and to assess the propriety of the representations forming the basis of the petitions that he files—authority that, as our cases reflect, cannot be controlled by the other branches of government. At the same time, the Constitution endows the Court with the judicial power to discipline attorneys admitted to its bar. The potential for direct scrutiny by a court to whom representations are made wholly accommodates the legitimate interests of all branches of government. Were we to hold otherwise and instead allow collateral attacks like the commission's lawsuit, we would improperly invade the executive branch's prerogatives and risk the politicization and thus the independence of the judiciary. We decline to stretch the judicial power beyond its constitutional boundaries.

Accordingly, the Chief Disciplinary Counsel was right to have initially declined to pursue the matter, and the Board of Disciplinary Appeals was wrong to have reversed course. Likewise, the trial court was right to have dismissed the commission's lawsuit, and the court of appeals was wrong to have reversed that determination. We therefore reverse the judgment of the court of appeals and reinstate the trial court's judgment of dismissal for lack of subject-matter jurisdiction.

3

**I**

After the 2020 presidential election, the State of Texas moved for leave to invoke the U.S. Supreme Court's original jurisdiction. The bill of complaint accompanying the motion alleged that non-legislative actors in the Commonwealth of Pennsylvania and the States of Georgia, Michigan, and Wisconsin altered state election statutes in violation of several provisions of the U.S. Constitution. Texas also moved for a preliminary injunction and a temporary restraining order or, alternatively, for a stay and an administrative stay, and sought expedited consideration of its pleadings. Webster, the First Assistant Attorney General of Texas, appeared on the pleadings. His name was listed below that of Attorney General Paxton, who signed the pleadings as counsel of record.

The State's legal theories, however, were never tested on their merits. Four days after Texas moved for leave, the Supreme Court dismissed the case "for lack of standing"—albeit with two justices stating that they would have granted Texas's motion for leave. *Texas v. Pennsylvania*, 141 S. Ct. 1230, 1230 (2020) (mem.); *see id.* (statement of Alito, J., joined by Thomas, J.). The case garnered national attention and fomented substantial public controversy. States across the Union filed amicus briefs in support of both Texas and the defendant states.

In the wake of the filing, various individuals brought "grievances"—*i.e.*, "written statement[s], from whatever source, apparently intended to allege Professional Misconduct"—against the attorney general and the first assistant. *See* Tex. Rules Disciplinary P. R. 1.06(R). Among the grievances was Brynne VanHettinga's. VanHettinga does not reside in Texas, is an inactive member of the State

4

Bar of Texas, and has no connection to the underlying litigation. Nevertheless, she faulted the first assistant for making "specious legal arguments and unsupported factual assertions" in the initial pleadings.

The law has changed in one respect since VanHettinga filed her grievance. If filed today, such a grievance would go nowhere because VanHettinga lacked "a cognizable individual interest in or connection to the legal matter or facts alleged in the grievance." Tex. Gov't Code § 81.073(a)(1)(B)(vi), (2)(B). The legislature added this cognizable-individual-interest requirement last year. *See* Act of May 24, 2023, 88th Leg., R.S., ch. 1020, § 1, sec. 81.073, 2023 Tex. Gen. Laws 3232, 3232–33 (codified at Tex. Gov't Code § 81.073); *see also* Tex. Rules Disciplinary P. R. 1.06(G) (amended in 2023 following the statutory enactment). But this case applies the preexisting requirements, under which VanHettinga's irrelevance to the underlying litigation did not foreclose her ability to invoke the process.

What then ensued—and, if brought in compliance with current law, would ensue today—was prescribed by the Texas Rules of Disciplinary Procedure. To begin, the Office of the Chief Disciplinary Counsel (CDC) received the grievance and initially dismissed it for "not alleg[ing] Professional Misconduct." *See* Tex. Rules Disciplinary P. R. 1.06(T); *see also* Tex. Gov't Code § 81.074(1) (explaining that the CDC shall "dismiss a grievance" that does not allege professional misconduct). VanHettinga appealed that decision to the Board of Disciplinary Appeals (BODA), which reversed. BODA determined that the grievance "allege[d] a possible violation" of the Texas Disciplinary Rules of Professional Conduct.

5

BODA's determination transformed the "grievance" into a "complaint," triggering further phases of the attorney-discipline process. *See generally* Tex. Rules Disciplinary P. R. 2.10(B), 2.12.  After the first assistant responded to the allegations, *see id.* R. 2.10(B), the CDC "investigate[d]" the complaint to determine whether to proceed, *id.* R. 2.12(A).  That led the CDC to schedule a hearing before a non-adversarial investigatory panel, *see id.* R. 1.06(W), which concluded that "there [was] credible evidence to support a finding of Professional Misconduct."  The rules then put the first assistant to a choice: Accept the panel's recommended sanction, *see id.* R. 2.14(D), or have the complaint "heard in a district court of proper venue, with or without a jury, or by an Evidentiary Panel," *id.* R. 2.15.

The first assistant chose the district court, so the CDC filed a four-page disciplinary petition in Williamson County on behalf of the commission.  *See generally id.* R. 3.01–.03 (providing that the CDC "*shall* promptly file the Disciplinary Petition" (emphasis added)).  The commission alleged that when the first assistant "filed" the initial pleadings, he made "misrepresentations," "false statements," and "representations [that] were dishonest."  It identified these six:

1. An outcome-determinative number of votes were tied to unregistered voters.

2. Votes were switched by a voting-machine glitch.

3. State actors unconstitutionally revised their state's election statutes.

4. Illegal votes affecting the election's outcome had been cast.

5. Texas had uncovered substantial evidence that raised serious doubts about the integrity of the

6

election process in the defendant States.

6.     Texas had standing to bring its claims before the U.S. Supreme Court.

According to the commission, by appearing on a pleading containing those statements, the first assistant violated Texas Disciplinary Rule of Professional Conduct 8.04(a)(3), which provides that "[a] lawyer shall not . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation." The six statements, the commission alleged, contravened Rule 8.04(a)(3) because they were not "supported by any charge, indictment, judicial finding, and/or credible or admissible evidence."

Also important is what the commission did *not* allege. It has never suggested that the first assistant acted without authority (*i.e.*, that he acted *ultra vires*) or that he engaged in criminal conduct. And it is undisputed that the Supreme Court did not sanction the first assistant (or anyone else) for the challenged representations (or anything else). That Court made no referral for discipline to any other body. Nor did any party to the case raise any complaint about the pleadings.

After the commission filed its petition in the district court, the first assistant filed a plea to the jurisdiction, arguing that the separation-of-powers doctrine—or alternatively, sovereign immunity—rendered the commission's petition nonjusticiable. Following a hearing, the court found that "the separation of powers doctrine deprive[d] [it] of subject matter jurisdiction."

The commission appealed. For docket-equalization purposes, this Court transferred the case to the Eighth Court of Appeals, which reversed. 676 S.W.3d 687, 691 (Tex. App.—El Paso 2023); *see also id.* at

703 (Soto, J., concurring without separate opinion). The court of appeals held that neither the separation-of-powers doctrine nor sovereign immunity required dismissal. *Id.* at 691, 699, 702. It reasoned that these disciplinary proceedings do not violate the separation of powers because (1) the commission does not challenge the first assistant's decision to file suit; (2) the first assistant's broad constitutional discretion (through the attorney general) is limited by the rules of professional conduct; and (3) exempting the first assistant from those rules is unnecessary for his ability "to effectively exercise the Attorney General's core powers." *Id.* at 697–99. As to sovereign immunity, the court explained that (1) the "petition targets Webster personally," not the State; (2) discipline against Webster would not amount to seeking to "control state action"; (3) there was no risk of overdeterrence, as pursuing discipline in this context would deter only violations of Rule 8.04(a)(3); and (4) there would be no harm to the public fisc. *Id.* at 700–02. The court remanded to the district court for proceedings on the merits. *Id.* at 703.

We granted Webster's petition for review.

## II

Whether a dispute is justiciable is a legal question that this Court reviews de novo. *See City of Elsa v. Gonzalez*, 325 S.W.3d 622, 625 (Tex. 2010).

## A

Like the United States and our sister states, ours is a tripartite system of government, whose powers are "divided into three distinct departments": legislative, executive, and judicial. Tex. Const. art. II, § 1; *see also id.* arts. III–V. The People's commitment to the separation of

8

powers predates not just statehood but our days as a republic. The 1824 Constitution of Mexico and the 1827 Constitution of the State of Coahuila y Tejas both contained separation-of-powers provisions that forbade the unification or usurpation of power between or among the branches. *See* 1 H.P.N. Gammel, *The Laws of Texas 1822-1897*, at 73, 426 (1898). The very first provision of the Constitution of the Republic of Texas likewise provided that "[t]he powers of this Government shall be divided into three departments, viz: Legislative, Executive and Judicial, which shall remain forever separate and distinct." Tex. Const. of 1836, art. I, § 1. And beginning in 1845, each Constitution of the State of Texas has contained the following text:

> The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: those which are Legislative to one, those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.

Tex. Const. art. II, § 1; *Terrazas v. Ramirez*, 829 S.W.2d 712, 733 (Tex. 1991) (Cornyn, J., concurring) (noting that the separation-of-powers clause "has been present in every Texas Constitution since 1845").

Respect for this "fiat of the [P]eople"—the separation of governmental powers—leads each branch to avoid stoking needless friction with the other coordinate branches of government. *See Lytle v. Halff*, 12 S.W. 610, 611 (Tex. 1889) (observing that the executive, legislative, and judicial departments cannot "enlarge, restrict, or destroy the powers of any one of th[em]"). True, *some* friction in tripartite

9

government is inevitable and indeed salutary. *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) ("[The U.S. Constitution] enjoins upon its branches separateness but interdependence, autonomy but reciprocity."). But as this Court has confirmed, constitutional problems arise when one branch pushes beyond the boundaries to interfere with another branch's exercise of its constitutional powers. *Maud v. Terrell*, 200 S.W. 375, 376 (Tex. 1918); *State Bd. of Ins. v. Betts*, 308 S.W.2d 846, 851–52 (Tex. 1958).

If one branch seeks to seize power belonging solely to another, the constitutional implication is obvious—the offending branch's claim is invalid. But "separation-of-powers disputes" often arise when "*none* of the [competing constitutional] claims, at least when viewed in isolation, is invalid." *In re Tex. House of Representatives*, 702 S.W.3d 330, 340 (Tex. 2024) (emphasis added). Quite commonly, "[e]ach of the multiple claims of power at issue" is "valid and entitled to respect," requiring the Court "to ensure that no branch is exercising its core authority in a way that negates the ability of a coordinate branch to do so." *Id.* at 340, 344. The doctrines of constitutional avoidance and of presuming good faith on the part of other governmental actors assist in this task. Both doctrines manifest the judiciary's commitment to the separation of powers, respect for the other branches, and desire to prevent constitutional friction unless and until unavoidable.

Our recent cases employ these constitutional principles. In *In re Turner*, this Court weighed whether a gubernatorial veto "threaten[ed] the Legislature's ability to operate." 627 S.W.3d 654, 656 (Tex. 2021). Just one year later, in *Van Dorn Preston v. M1 Support Services, L.P.*, the

10

Court wrestled with "whether judicial review of military action in a suit" interfered with the "Executive Branch's constitutional authority over the armed forces." 642 S.W.3d 452, 455 (Tex. 2022). Later that year, in *In re Stetson Renewables Holdings, LLC*, we considered "whether relators ha[d] a judicially enforceable right to compel [an executive branch official] to act" given scarce resources and an expiring statutory program. 658 S.W.3d 292, 295 (Tex. 2022). In each case, the ability of the courts to proceed reduced to whether doing so would create unwarranted conflict with the constitutional prerogatives of our co-equal branches.

Hence, in *Turner*, we recognized that we have a "duty to avoid unnecessary constitutional issues," which meant refraining from exercising jurisdiction "to resolve disputes between the other two branches that those branches c[ould] resolve for themselves." 627 S.W.3d at 660–61 (quoting *Sullivan v. McDonald*, 913 A.2d 403, 406 (Conn. 2007)). Even when the dispute is "one between the members of one branch rather than one between the branches," we will avoid exercising jurisdiction out of respect for the separation of powers. *Id.* at 661.

We put these principles to practice in *Van Dorn*, where we concluded that we had "constitutional jurisdiction to resolve the dispute"—but only after assuring ourselves that doing so did not involve or trespass into the executive branch's "expertise or judgment." 642 S.W.3d at 465. And in *Stetson*, we held that we could not compel the comptroller—an executive-branch official—to act, because such an order would unnecessarily pit the judicial department against the prerogatives of the coordinate branches and risked invading the official's "exercise of discretion." 658 S.W.3d at 296.

11

The dissent suggests that the separation-of-powers doctrine cannot "restrict the *means* by which a department [of government] may exercise a power it properly possesses." *Post* at 2 (Boyd, J., dissenting). To the extent that cryptic statement means that each branch of government may fulfill its constitutional duties by using the powers "properly" at its disposal without another branch's interference, we agree. But the use of a given power—even one that, in a vacuum, is unquestionably proper—can sometimes impair the work of another branch. When that happens, the whole point of the separation-of-powers doctrine is to determine whether one "means" rather than another is permissible.

Just last month, for example, we expressly held that "the legislature's authority to compel witness testimony is unquestionably valid" and specifically that it was a proper means to achieve the important legislative objective of gathering information. *In re Tex. House of Representatives*, 702 S.W.3d at 346. But we simultaneously held that this very means violated the separation of powers when a legislative subpoena would have the effect of blocking a lawfully scheduled execution. *Id.* at 346–47. To "accommodat[e] the interests of all branches of the government," we determined that there was no "judicially enforceable right" to make use of what otherwise is an entirely lawful *means* of proceeding—because compelling testimony under those circumstances would "ru[n] up against equally valid powers of the other branches." *Id.*

Accordingly, in separation-of-powers cases involving competing exercises of valid constitutional authority, it is rarely enough to conclude that a branch of government possesses a particular "means" to achieve an

12

appropriate goal of that branch. Rather, it is our duty to determine whether a coordinate branch's exercise of power—and *especially* our own exercise of power—"rise[s] to the level of constitutionally forbidden impairment of [another branch's] ability to perform its [powers]." *Clinton v. Jones*, 520 U.S. 681, 699–703 (1997); *see also, e.g.*, *In re Dallas County*, 697 S.W.3d 142, 163 (Tex. 2024) ("[T]he separation of powers requires that we respect the other branches' checks on the judiciary and not just our checks on them.").

**B**

The separation-of-powers problem in this case involves two specific powers, both of which are valid: the judiciary's authority to regulate the practice of law and the attorney general's exclusive authority to determine the arguments and assess the evidence that warrant bringing suit on behalf of the State. "These powers do not exist in isolation but converge in a particular context," *In re Tex. House of Representatives*, 702 S.W.3d at 340, which requires the Court to accommodate both constitutional interests by preventing one from swallowing up the other.

**1**

We begin by describing the commission and defining the judicial power at issue in this case.

The commission is "a standing committee of the state bar," Tex. Gov't Code § 81.076(b), which is "an administrative agency of the judicial department of government," *id.* § 81.011(a). The commission does not resemble the judiciary and, instead of being staffed by judges, has six lawyers and six public members (*i.e.*, non-lawyers) who serve staggered

13

three-year terms. *See id.* § 81.076(b), (c). "The president of the state bar appoints the attorney members," and this Court "appoints the public members." *Id.* § 81.076(b).

Although the commission's work necessarily implicates derivative judicial power, the commission does not purport to be a court or even a substitute for a court. It does not claim the judicial power, for example, to adjudicate cases or liquidate law—power that we have sometimes called "our jurisdictional power." *See, e.g.*, *Eichelberger v. Eichelberger*, 582 S.W.2d 395, 400 (Tex. 1979). Rather, it and the state bar serve as an "aid" to "the judicial department's powers under the [Texas] [C]onstitution to regulate the practice of law, and not to the exclusion of those powers." Tex. Gov't Code § 81.011(b). We have referred to this kind of judicial authority as falling within our "administrative powers." *State Bar of Tex. v. Gomez*, 891 S.W.2d 243, 245 (Tex. 1994) (emphasis omitted).

However demarcated, the Constitution vests all "judicial power" only in courts and, for present purposes, "in one Supreme Court." Tex. Const. art. V, § 1. The judicial power at issue here is of the administrative kind and is among the Court's "inherent power[s]" that are "not secured by any legislative grant" and are "necessarily implied to enable the Court to discharge its constitutionally imposed duties." *Gomez*, 891 S.W.2d at 245. We have described this Court's inherent powers as "woven into the fabric of the [Texas] [C]onstitution by virtue of their origin in the common law and the mandate of . . . the separation of powers between three co-equal branches." *Eichelberger*, 582 S.W.2d at 398 (citing Tex. Const. art. II, § 1). Broadly, the inherent powers "enable our courts to effectively perform their judicial functions and to protect their dignity,

14

independence[,] and integrity." *Id.* at 399.

As relevant to this case, we have held that the judicial power necessarily includes the "power to regulate the practice of law in Texas for the benefit and protection of the justice system and the people as a whole." *In re Nolo Press/Folk Law, Inc.*, 991 S.W.2d 768, 769 (Tex. 1999); *see also Unauthorized Prac. Comm. v. Cortez*, 692 S.W.2d 47, 51 (Tex. 1985). Because bar admission and practice are "inextricably intertwined with the administration of justice, the Court must have the power to regulate these activities in order to fulfill its constitutional role." *Gomez*, 891 S.W.2d at 245. Our early cases, for example, took it as a given that this power is "necessarily inherent in all courts possessing . . . general jurisdiction." *Scott v. State*, 24 S.W. 789, 790 (Tex. 1894); *see also Jackson v. State*, 21 Tex. 668, 673 (1858).

Denominating the judiciary's authority to regulate the practice of law as an "inherent power" is another way of stating that the original public meaning of the "judicial power" created by the Texas Constitution includes such authority. This aspect of the judicial power traces from "the days of the Inns of Court in common law English jurisprudence," *Eichelberger*, 582 S.W.2d at 398–99, to the time the People adopted article V, § 1 into the Texas Constitution in 1876.

As the English legal system developed within the common law, so too did the "unity of interest between the courts and the legal profession." Thomas M. Alpert, *The Inherent Power of the Courts to Regulate the Practice of Law: An Historical Analysis*, 32 Buff. L. Rev. 525, 529 (1983). The courts, specifically, were "unique[ly]" interested in exercising authority over the profession. *Id.* After King Edward I "ceded control

15

over [the profession] to the justices of his courts," *id.* at 530, "[t]he attorneys' branch was henceforth a closed profession, reserved for those who had been educated to it, and admitted to it, in the official course"— but always "under the direction of the court[s]," Theodore F. T. Plucknett, *A Concise History of the Common Law* 217–18 (5th ed. 1956).

The "attorney," eventually synonymous with the modern English solicitor, was "an officer of the court," a privilege that meant he was directly "subject to its orders." *People ex rel. Karlin v. Culkin*, 248 N.Y. 465, 472–73 (1928) (Cardozo, C.J.); *see also* Alpert, *supra,* at 530–31 & n.26. Attorneys' distinction as officers of the court made them, as Blackstone recounted, *"peculiarly subject* to the censure and animadversion of the judges." 3 William Blackstone, *Commentaries* *26 (emphasis added); *see also Culkin*, 248 N.Y. at 475–76 (discussing the English courts' system "for a continuing inquiry into the [attorneys'] conduct" and "with a view to their discipline and removal by a court of civil jurisdiction").

Unsurprisingly, like the English courts, colonial courts exercised authority over the practice of law. *See* Charles Warren, *A History of the American Bar* 86, 109, 113, 121, 123, 130 (1911) (noting the courts' roles in Massachusetts, Pennsylvania, New Jersey, the Carolinas, and Connecticut). This continued after the ratification of the U.S. Constitution and over the first century of American independence, including when Texas joined the Union and ratified the current Constitution. Adhering to common-law practice, the U.S. Supreme Court referred to attorneys as "its officers." *Ex parte Secombe*, 60 U.S. (19 How.) 9, 13 (1856); *see also Ex parte Burr*, 22 U.S. (9 Wheat.) 529, 530–31 (1824). Indeed, these

16

"officers of the court" could "only be deprived of their [privileges]" or admitted to practice through the "exercise of judicial power." *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 378–79 (1866). State courts echoed these sentiments throughout the nineteenth century. *E.g.*, *Ex parte Brown*, 2 Miss. 303, 306–07 (Miss. Err. & App. 1836); *People ex rel. Mulford v. Turner*, 1 Cal. 143, 150 (1850); *State ex rel. Walker v. Mullins*, 31 S.W. 744, 745 (Mo. 1895).

Most importantly, this Court did so, both before and after the adoption of the present article V, § 1. *See Scott*, 24 S.W. at 790; *Jackson*, 21 Tex. at 673. The Court embraced the "officer of the court" concept from the beginning. *See, e.g.*, *State v. Johnson*, 12 Tex. 231, 238 (1854) ("The District Attorney is not only an officer of the State, but also, *in common with other attorneys, an officer of the Court.*" (emphasis added)); *Richardson v. Wells*, 3 Tex. 223, 227–28 (1848) (observing that "an attorney" is "an officer of the court").

References to "inherent" power in the context of attorney discipline and admissions, in short, reflect that the original public meaning of the judicial power in 1876 included the courts' "inherent power" to regulate the practice of law. *See Nolo Press*, 991 S.W.2d at 769; *State v. Robinson*, 26 Tex. 367, 371 (1862) (noting that the power to "disfranchise attorneys, before and without conviction or indictment[,] . . . should be independent" and "should be regarded as one of the inherent powers"). As one well-known legal-ethics scholar observed in 1989, "[a] century or more ago the predominant role of courts in regulating lawyers would have seemed simply inescapable, natural, and inevitable to anyone." Charles W. Wolfram, *Lawyer Turf and Lawyer Regulation—The Role of the Inherent-*

*Powers Doctrine*, 12 U. Ark. at Little Rock L. Rev. 1, 5 (1989). It is this jurisprudential history that animates statements like our observation that "the Court [itself] must have the power to regulate" the practice of law "to fulfill its constitutional role." *Gomez*, 891 S.W.2d at 245.

At the same time, the three branches can and have worked together in this context. For instance, to "aid" this Court in the exercise of its judicial power "to regulate the practice of law," *see* Tex. Gov't Code § 81.011(b), the legislature enacted the State Bar Act, which simply "provide[d] a statutory mechanism for promulgating regulations governing the practice of law," *Gomez*, 891 S.W.2d at 245. The legislature explicitly disclaimed that the State Bar Act operated "to the exclusion of [the judicial department's] powers." Tex. Gov't Code § 81.011(b). And "[t]he Legislature has acknowledged that the Court has exclusive authority to adopt rules governing admission to the practice of law in Texas." *Unauthorized Prac. of Law Comm. v. Am. Home Assurance Co.*, 261 S.W.3d 24, 33 (Tex. 2008); *see* Tex. Gov't Code § 81.061 ("Rules governing the admission to the practice of law are within the exclusive jurisdiction of the supreme court."). Legislative willingness to assist the judiciary without purporting to invade the judiciary's inherent authority is consistent with the Constitution's use of the term "judicial power."

The commission's very existence concretely illustrates how the branches have cooperated in this area. Some history provides context. The commission was not officially created until 1991, replacing the then-existing "grievance oversight committee." *See* Act of May 23, 1991, 72d Leg., R.S., ch. 795, § 21, 1991 Tex. Gen. Laws 2794, 2801. The path toward a more uniform and, at least from the courts' perspective, less

18

burdensome disciplinary system was already well-trodden by then. In 1939, the first State Bar Act encouraged systematizing and simplifying the disciplinary process by "empowering the Supreme Court to prepare, propose, adopt[,] and promulgate rules and regulations for disciplining, suspending[,] and disbarring attorneys at law." *See* Act of Apr. 6, 1939, 46th Leg., R.S., ch. 1, 1939 Tex. Gen. Laws 64, 64.

Commentary from the very first issues of the *Texas Bar Journal* highlighted how both the state legislature and the legal profession were under public pressure to integrate the State Bar and "stream-lin[e] and modernize" the disciplinary rules. *E.g.*, Ben H. Powell, *To the Members of the Texas Bar Association*, 1 Tex. B.J. 356, 356 (1938) (letter from the then-president of the Texas Bar Association). Perhaps with some exaggeration, one State Bar Act proponent observed that as things stood, it was "virtually impossible to bar any lawyer from further practice regardless of how reprehensible his actions may have been or how much his unscrupulous and shady transactions may have hurt the legal profession." *See* F. E. Knetcsch, *Have Lawyers 'Slipped' as Leaders? A Legislator Says We Have, and Suggests a Remedy*, 1 Tex. B.J. 357, 370 (1938). To "curb[] this evil," "full time officers" within the then-voluntary Texas Bar Association could assist the judiciary to more "promptly and effectively disbar the [unscrupulous practitioners] from our ranks" should the State Bar Act become law. *Id.*

It did become law, and ever since then, the State Bar Act and its successive amendments have yielded many efficiencies. We need not look further than our own docket to recognize the commission's valuable contribution to safeguarding Texas citizens from unscrupulous lawyers

while ensuring fairness and evenhandedness to lawyers subjected to challenges. This Court could not do that job alone.

But the commission's contributions are only the latest example. Throughout Texas history, this Court disciplined, suspended, and when necessary, disbarred attorneys admitted to practice in Texas. To facilitate that authority, the Third Congress of the Republic of Texas passed a law (exactly a century before the State Bar Act, as it happens) that the State's first legislature adopted in 1846—a statute "[t]o regulate the License and Practice of Attornies and Counsellors at Law." 2 Gammel, *supra*, at 1551–55; *see id.* at 136–39 (the 1839 enactment). The statute provided that attorneys who are guilty of "any fraudulent or dishonorable conduct, or of any mal-practice," could be "suspended or stricken from the roll of attornies at the direction of the court; and any attorney who may be stricken from the roll, shall not afterwards be allowed to practice in any court of the State, unless reinstated on appeal to the supreme court." *Id.* at 1553. The legislature provided that a Texas attorney could be prosecuted "by motion or information of any two or more practicing attornies of any court in which the party prosecuted may practice, . . . and the motion or information shall be made and carried on in the name of the State of Texas." *Id.* at 1553–54; *see also* 3 Gammel, *supra*, at 1562 (1854 amendments). Thus, the legislature has long assisted the judicial branch in the discharge of its duties by providing supplemental tools for streamlining discipline and using the bar—in other words, other attorneys—to maintain discipline.

We disbarred at least one attorney with the aid of these provisions. In *Dillon v. State*, an attorney sought a divorce for Mrs. Martha Ann

20

Walker after a mysterious "gentleman he did not know" supposedly requested that he "bring the suit." 6 Tex. 55, 58–59 (1851). It turned out, however, that the attorney sought the divorce "without any authority whatever from [Mrs. Walker]." *Id.* at 58. In response, two attorneys invoked the statutory mechanism and moved for the trial court to order the attorney to show cause for "why he should not be stricken from the roll of practicing attorneys on a charge of malpractice." *Id.* at 55. We found the attorney's story "altogether too improbable to be entitled to the least possible credence." *Id.* at 59. Rather, it was more likely that the attorney "act[ed] in fraudulent collusion with the husband to procure the divorce without the knowledge and consent of the wife." *Id.* at 59–60. Thus, the trial court was "fully justified . . . in revoking his license." *Id.* at 60.

A few years later, in *Jackson*, we confirmed that these early statutory provisions facilitated but did not supplant the inherent authority of the courts—they made discipline easier and more uniform, but they did not make discipline *possible* or confine its administration to new forms. The "power to enforce the forfeiture [of an attorney's professional franchise] must be lodged" in the courts, as "[s]uch a power is indispensable to preserve the administration of justice." *Jackson*, 21 Tex. at 672–73. There, we reversed a trial court's decision to strike an attorney from the rolls where nothing in the record supported the judgment. *See id.* Several decades later, in *Scott*, we reversed the court of civil appeals after it dismissed the judgment against an attorney that "revok[ed] his license to practice law" and "str[uck] his name from the roll of attorneys." 24 S.W. at 789. This Court observed that the legislature

21

did "not expressly confe[r]" the "power to disbar attorneys" on the district courts, but we reiterated that "[t]he power to disbar attorneys . . . is a power necessarily inherent in all courts possessing such general jurisdiction as is given to the district courts by the [C]onstitution." *Id.* at 790; *see also Robinson*, 26 Tex. at 371.

Proceeding in these ways was laborious and at least risked a perception of variation and inconsistency; the creation of the State Bar and the various disciplinary bodies within it since 1939 has sought to mitigate these problems. The current commission plays its role in this effort in reliance on its relationship with this Court for its ability to subject attorneys to scrutiny—potentially life-altering scrutiny, given the consequences of discipline. Early on, we recognized that "proceeding to disbar an attorney may be highly penal" because he may be "deprived of the right to pursue and reap the profits of a profession, to fit himself for which he may have spent years of toil, and upon which he is dependent for a livelihood." *Scott*, 24 S.W. at 789.

Our history and jurisprudence therefore reflect that the commission has a significant but limited role in assisting this Court in its duty to superintend the admission to the practice of law and the role of attorneys within the judicial system. The importance of professional discipline is unquestioned, and it is part of the judicial power itself for courts to be able to demand that any attorney appearing before them adhere to professional standards. Direct review of conduct before a tribunal is part of this history.

The commission, by contrast, does not wield an identical version of the courts' disciplinary power in all contexts. Like the larger state bar

itself, the commission's exercise of any authority is derivative of this Court's inherent powers and is to be deployed as an administrative aid to the Court. Put to practice, this means that any exercise of power that would have been improper or unauthorized for this Court to undertake before the commission's creation would necessarily be improper and unauthorized for the commission to undertake now. The commission is bound by these limitations on judicial authority even as it does not, and indeed could not, remotely exercise the full judicial power. As we have described, under the statute creating it, none of its members are active judges, and the judiciary does not even select the majority of the commission's members—let alone control the statutory appointment scheme set forth by the legislature. This case provides no occasion to examine any tension that could arise between how the commission is structured and its proper role as an administrative aid to this Court's exercise of its inherent powers. It is enough to recognize that while the Court, the rest of the judiciary, the public, and the profession itself all benefit from the State Bar Act, which creates the commission, the Act is not the source—much less the sum—of judicial authority to regulate the practice of law.

In addition to this and other inherent judicial powers vested in this Court by article V, § 1 and reserved to the judicial department under article II, § 1, the Constitution expressly imposes certain duties on the Court, including the promulgation of rules of civil procedure and judicial administration. *See* Tex. Const. art. V, § 31. This aspect of the Court's role is addressed in and facilitated by other chapters of the Government Code and does not directly affect the case now before us.

23

Pitted against the commission's derivative exercise of judicial power is the first assistant, who "operates under the direct supervision of the Attorney General." 7 Tex. Jur. 3d Attorney General § 4; *see also* Tex. Gov't Code § 402.001(a) ("If the attorney general is absent or unable to act, the attorney general's first office assistant shall perform the duties of the attorney general that are prescribed by law."). Under our Constitution, the attorney general is an executive-department officer "whose primary duties are to render legal advice in opinions to various political agencies and to represent the State in civil litigation." *Perry v. Del Rio*, 67 S.W.3d 85, 91 (Tex. 2001) (first citing Tex. Const. art. IV, §§ 1, 22; and then citing Tex. Gov't Code § 402.021). Like the commission, which derives its constitutional power from the judicial department, the first assistant derives any authority that he may exercise from the executive department—and specifically from the attorney general, whose authority comes from the Constitution and from statutes. The degree to which the commission and the first assistant exercise constitutional powers, however, is far from the same.

Because all the "constitutional and statutory authority is vested in *one* Attorney General," the first assistant's exercise of power is intertwined with and can never exceed the attorney general's. *See PUC v. Cofer*, 754 S.W.2d 121, 123–24 (Tex. 1988) (noting that "the various assistant attorneys general have no constitutional or statutory authority that is not derived directly from the Attorney General himself"). That distinguishes him from the commission, which cannot exercise the full judicial power. He instead must operate next to and in tandem with the

constitutional source of power. In other words, when the first assistant acts under the direction of the attorney general, he does so as if the attorney general himself had acted. Like other high executive-branch officials elected by the People, the attorney general cannot exercise the function of his office—or at least very little of it—without assistance from those who work under his direction. The challenge posed by the commission, therefore, is a challenge to the powers entrusted to the attorney general.

Those powers have deep roots. We have observed that the office of the attorney general "is one of ancient origin." *Charles Scribner's Sons v. Marrs*, 262 S.W. 722, 727 (Tex. 1924). "This personage was the chief law officer of the [English] Crown, and its only legal representative in the courts." John Ben Shepperd, *Common Law Powers and Duties of the Attorney General*, 7 Baylor L. Rev. 1, 1 (1955). As such, he was subject to the Crown's wishes, but his office was also vested with substantial power, discretion, and "exceptional privileges." *See* 6 W. S. Holdsworth, *A History of English Law* 468–69 (1924).

The Office of the Attorney General of Texas preexisted our statehood and was incorporated into our first constitution. Shepperd, *supra*, at 4–5. In relevant part, the current constitutional provision states as follows:

> The Attorney General shall represent the State in all suits and pleas in the Supreme Court of the State in which the State may be a party, and [he] shall . . . perform such other duties as may be required by law.

Tex. Const. art. IV, § 22. By this text—and a related statute empowering him to "prosecute and defend all actions in which the state is interested

25

before the supreme court and courts of appeals," Tex. Gov't Code § 402.021—the attorney general is "clothed with important powers and responsibilities," *Marrs*, 262 S.W. at 729. Like the common-law attorney general, the Texas attorney general "is the chief law officer of the State." *Agey v. Am. Lib. Pipe Line Co.*, 172 S.W.2d 972, 974 (Tex. 1943). He is likewise subject to the will of the sovereign—no longer the Crown but now the People. Still, his office's duties remain "multifarious, neces[s]arily involving at all times the exercise of broad judgment and discretion." *Marrs*, 262 S.W. at 727. A century ago, we resolved that this "judgment and discretion . . . *will not be* controlled by other authorities." *Id.* (emphasis added).

That judgment and discretion includes not only bringing and defending lawsuits but also, as we expressed in *Agey*, the "right to investigate the facts and [to] exercise his judgment and discretion regarding" the suits in which the State is an interested party. 172 S.W.2d at 974. For example, his "filing of a suit," *id.*, depends on his "examin[ation] into the facts of the alleged offense, and [his] find[ing] not only that there is reasonable ground to believe that the statute has been violated, but also that the evidence necessary to a successful prosecution of the suit can be procured," *Lewright v. Bell*, 63 S.W. 623, 624 (Tex. 1901).

Of course, *every* attorney can and should investigate the underlying facts, assess the likelihood of procuring evidence to support the potential claims, determine whether the facts and the law justify bringing suit or asserting a defense, and otherwise exercise sound judgment in whether and how to do so. This process captures the essence of the profession, at least for those attorneys who practice litigation. And

26

yet we would not have needed to make those points so markedly in cases like *Agey*, *Lewright*, and *Marrs* if the attorney general's authority were merely the same as every other attorney's. Those decisions stand for an entirely different point: that the attorney general's assessments in bringing suit are privileged at a *constitutional* level from collateral review by the other branches.

At the same time, of course, the "powers of the office of Attorney General are limited." *State v. Thomas*, 766 S.W.2d 217, 224 (Tex. 1989) (Hecht, J., dissenting); *see also Florida ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266, 276 (5th Cir. 1976) (Coleman, J., dissenting) (noting that while a state attorney general is "the chief law officer of the realm, he does not exercise [his] authority as an unlimited monarch, governed only by his own judgment"). Though he has "broad discretionary power in carrying out his responsibility to represent the State," "the Attorney General can only act within the limits of the Texas Constitution and statutes." *Del Rio*, 67 S.W.3d at 92. In suits brought by the attorney general, therefore, the authority of the court hearing the case naturally includes holding even the attorney general (and any other executive-branch lawyer) to account for litigation conduct. This allowance is consonant with our repeated observation that the coordinate departments cannot "enlarge, restrict, or destroy the powers of any one of th[em]." *Lytle*, 12 S.W. at 611; *see also Del Rio*, 67 S.W.3d at 91–92 (quoting *Garcia v. Laughlin*, 285 S.W.2d 191, 194 (Tex. 1955)).

\* \* \*

The underlying interests of both branches are valid. The judicial branch has the authority to demand compliance with the rules of

27

professional discipline from attorneys who invoke a court's jurisdiction, including those from the executive branch. The executive branch has the authority to make determinations about the propriety of filing suit without the other branches' attempts at control. The question for this Court, then, is whether one of these interests may trump the other or whether—and how—they may both be accommodated in our constitutional tradition of the separation of powers.

## III

We do not find the call to be close. *Direct* scrutiny within the judicial process accommodates the inherent authority and responsibility of the judicial branch. A court that perceives or is alerted to a professional violation may address it, always sensitive to a coordinate branch's authority, its entitlement to respect, and the presumptions of good faith and regularity that it is owed. But the commission claims authority for the judicial branch that the judiciary lacks: a free-ranging power to second-guess the attorney general's and his first assistant's exercise of discretion in making initial filings that is wholly divorced from and collateral to the litigation in which those filings are made. This claim of authority creates unauthorized friction between the judicial and executive departments. Exercising jurisdiction to reach the merits of the commission's lawsuit would violate the separation-of-powers doctrine.

## A

All appear to agree that the commission may not collaterally scrutinize the attorney general's (or the first assistant's) decision to *file* a lawsuit, no matter how controversial or problematic the suit may be. Instead, the commission argues that all our precedents concerning the

attorney general's core constitutional powers pertain *only* to that choice—his ultimate decision to *file* a suit. *E.g.*, *Lewright*, 63 S.W. at 624 (examining "the duty of the attorney general to institute suits"); *Marrs*, 262 S.W. at 727 (describing the attorney general's judgment and discretion in "bringing suits"); *Agey*, 172 S.W.2d at 974 (same "regarding the filing of a suit"); *cf. Thomas*, 766 S.W.2d at 219 (assessing the attorney general's ability to "take action 'in the courts'" (citation omitted)). From that premise, the commission contends—and the court of appeals agreed—that *filing* a suit is wholly distinct from making the representations within it. It then asserts that this case only targets the latter—the six alleged misrepresentations. So, it concludes, the disciplinary proceedings in no way "challenge the Attorney General's decision to *file* the suit" in the Supreme Court. 676 S.W.3d at 698.

We agree with the commission to an extent. The decision to file a case is at least in some respects distinct from the specific content of the case. An entirely defensible lawsuit may be infected with wholly indefensible allegations. But we disagree with the commission on a more important level. When referring to the attorney general's broad constitutional discretion, this Court has never drawn a line between these two actions—his authority to file suit and his authority to populate the suit with the representations that give it force and led him to file it. To the contrary, to the extent that they are privileged at all, *both* actions are privileged to the same degree.

The commission's argument is therefore foreclosed by our precedents. *See supra* Part II.B.2. In *Agey*, for example, we recognized the attorney general's responsibility "to institute in the proper courts

29

proceedings to enforce or protect any right of the public that [was] violated," which of course depended on his "investigat[ion] [of] the facts." 172 S.W.2d at 974. On other occasions, when addressing the attorney general's ability to "elec[t]" whether to bring suit, *Marrs*, 262 S.W. at 728, or to "examine into the facts of the alleged offense," *Lewright*, 63 S.W. at 624, we referred to his broad constitutional discretion to select legal arguments, assess the available facts and evidence, and then make the ultimate decision about whether to file suit. The attorney general's understanding of the facts and the law, of course, is what generates the content of the original petition—the allegations and representations made to the court.

In other words, it does not matter that the decision to file can be distinguished in a theoretical sense from selecting the contents of the filing. Those two activities are also integrally connected, which is why our cases treat them with an identical level of constitutional protection. We reaffirm this core constitutional principle today: When filing suit on behalf of the State without any allegation of criminal or *ultra vires* conduct, the attorney general (and hence the first assistant) is not subject to collateral review of either the choice to file a lawsuit *or* the representations in the suit's initial pleadings. Instead, if the contents of the pleadings are objectionable, whether for legal or ethical reasons, only *direct* scrutiny—that is, by the court to whom the pleadings are presented—is permissible under the separation-of-powers doctrine.

Our considerable case law is far from "no authority," *see post* at 7–8, for our application of the law. *See also infra* Part III.B.3 (further examining the relevant cases). Those cases explain the nature of the

constitutional conflict at issue. They provide the foundation for both principles: that direct review by a court of the attorney general's initial-filing decisions *cannot* be foreclosed without sacrificing the core judicial power of compelling adherence to the disciplinary rules and that collateral review *must* be foreclosed in this context to avoid sacrificing the authority that our cases unambiguously afford him.

## B

The foregoing analysis nearly resolves the case, but there is a bit more for us to do. Having refused to divorce the first assistant's decision to file the pleadings from the representations within them, we proceed to analyze whether the district court could exercise subject-matter jurisdiction over the commission's petition. We do so by reviewing the commission's "pleadings and factual assertions" that implicate the attorney general's exercise of constitutional powers delegated to the first assistant. *Cf. City of Elsa*, 325 S.W.3d at 625. We proceed in three steps: first, by defining the scope of our review; second, by analyzing the commission's specific allegations and its theory of the case; and third, by weighing the court of appeals' holding against our precedents.

### 1

At the outset, the commission argues that our review is limited. Specifically, it says that we cannot examine the alleged misrepresentations because doing so would prematurely address the merits of the disciplinary proceedings against the first assistant. This argument echoes the view of the court of appeals, under which the first assistant's defense of his alleged misrepresentations "ha[d] no bearing on the jurisdictional question before [it]." 676 S.W.3d at 698 (finding his

31

arguments "inappropriate"). Instead, all that mattered was that the commission's "petition meets all requirements of a disciplinary petition filed in a district court, including '[a] description of the acts and conduct that gave rise to the alleged Professional Misconduct' and '[a] listing of the specific [disciplinary] rules . . . allegedly violated by the acts or conduct.'" *Id.* at 695–96 (quoting Tex. Rules Disciplinary P. R. 3.01).

This approach would be proper for a purely private action, but it fails to account for how the "facts underlying the merits" and the facts underlying our jurisdiction can be "intertwined" in the context of a governmental plea to the jurisdiction. *E.g.*, *City of Fort Worth v. Pridgen*, 653 S.W.3d 176, 182 (Tex. 2022); *see also Van Dorn*, 642 S.W.3d at 458–59 (applying "separation of powers principles to determine whether jurisdiction existed" while discussing "disputed jurisdictional fact issues intertwined with the merits"). Sometimes, as here, that intersection is "unavoidabl[e]," at least in part. *See Chambers–Liberty Counties Navigation Dist. v. State*, 575 S.W.3d 339, 345 (Tex. 2019) (citing *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227–28 (Tex. 2004)). Our analysis of the separation-of-powers problem before us requires a review of the purported misrepresentations, especially where the constitutional injury the first assistant alleges is the commission's scrutiny of his representations filed in the U.S. Supreme Court. This analysis implicates but of course does not resolve the underlying merits of *whether* the first assistant violated Texas Disciplinary Rule of Professional Conduct 8.04(a)(3). *Cf. id.* at 349. Our holding, after all, is that reaching the merits is what a court may not do in these circumstances.

32

## 2

We conduct our review by "constru[ing] the pleadings liberally" in the commission's favor and "look[ing] to [its] intent." *Miranda*, 133 S.W.3d at 226. That review reveals, from the face of the commission's petition, that the specific allegations—whether well-founded or otherwise—impermissibly seek to challenge the first assistant's legal determinations and assessments of the available facts and evidence at the time he filed the initial pleadings in the Supreme Court. The theory of the commission's case against the first assistant is that he is liable for having "engage[d] in conduct involving dishonesty, fraud, deceit or misrepresentation," Tex. Disciplinary Rules Prof'l Conduct R. 8.04(a)(3), because his six alleged misrepresentations were not "supported by any charge, indictment, judicial finding, and/or credible or admissible evidence." Eschewing any limiting principle, the commission commits to a reading of Rule 8.04(a)(3) that it says is "broa[d] in scope" and that denotes "a lack of honesty, probity, or integrity in principle" as well as a "lack of straightforwardness."

This unbounded reading of Rule 8.04(a)(3) belies the commission's suggestion that it is simply attempting to hold the first assistant to the same standards of professional conduct as all other Texas-licensed attorneys. The deployment of Rule 8.04(a)(3) at the pleadings stage is particularly problematic. Demanding such things as "judicial findings" and "credible or admissible evidence" at the time the first assistant filed the bill of complaint raises a host of concerns—some that would apply whether the challenged attorney was in private practice or in public office, and some that are specific to the attorney general's authority.

33

For one thing, the commission's view of Rule 8.04(a)(3)'s demands is—at best—in tension with the minimum pleading standards for filing a federal complaint, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (holding that "[t]o survive a motion to dismiss," a claim must have "facial plausibility," meaning "more than a sheer possibility that a defendant has acted unlawfully"), as well as the commentary to our own disciplinary rules, *see, e.g.*, Tex. Disciplinary Rules Prof'l Conduct R. 3.01 cmt. 3 (noting that "[a] filing or contention" is "not frivolous . . . merely because the facts have not been first substantiated fully *or* because the lawyer expects to develop vital evidence only by discovery" (emphasis added)). We have some doubts, therefore, that the commission's charges under Rule 8.04(a)(3) would be permissible to scrutinize initial pleadings even in purely *private* litigation, but we need not resolve that question today. Suffice it to say that when a court holds a lawyer—any lawyer—to account under Rule 8.04(a)(3), whether directly or collaterally, it should do so with caution after giving that rule a careful reading.

More importantly, the commission's allegations are at odds with our case law regarding *who* is constitutionally entitled to assess the facts and the law that warrant bringing suit on behalf of the State. As we have reiterated, the attorney general's determinations about whether a lawsuit and its constituent parts are "supported by any charge, indictment, judicial finding, and/or credible or admissible evidence" are entrusted to the attorney general—not the commission. *See supra* Parts II.B.2, III.A.

We confronted an analogous situation in *Marrs*, where we issued a writ of mandamus directing the state superintendent to perform "the

34

ministerial acts required of him" by statute. *Marrs*, 262 S.W. at 723, 728. The relator had entered a contract to sell and furnish textbooks to the State, and the superintendent declined to observe the contract or perform "according to its terms." *Id.* at 728. But the attorney general, not the superintendent, was "the officer authorized by law to protect the interests of the state in matters of this kind, and to determine whether or not suits shall be brought . . . to test the validity of its contracts, or to annul them." *Id.* at 727. Such determinations, we said, are cloaked with political nuance. *See id.* at 728. For example, even supposing the contract in *Marrs* was procured by "fraud or collusion," the attorney general could still "elect" whether to bring suit, as "[i]t may be that the state would desire the benefits of [such] a contract." *Id.*

The commission here, like the superintendent in *Marrs*, seeks "to determine whether or not suits shall be brought," *see id.* at 727, and more, it attempts to second-guess the attorney general's judgment and discretion in populating the suit with the representations that gave it force. Yet "independent of [the commission's] judgment as to the wisdom of" the State's bill of complaint, the attorney general's "judgment and discretion . . . *will not* be controlled by other authorities." *Cf. id.* at 727–28 (emphasis added)). This principle would mean little if it did not bar subsequent second-guessing of the attorney general's decision, which is what we call collateral review.

The U.S. Supreme Court, of course, has full authority to discipline any attorneys appearing before it. It is the federal judicial system's court of last resort; lawyers appearing before it must be admitted by that Court to its own bar, over which it has exclusive control. For initial pleadings

35

filed in that or any other court by the attorney general, however, purely collateral review by Texas state authorities under Rule 8.04(a)(3) is impermissible because of its great risk of usurping the authority entrusted to the attorney general. Indeed, by targeting the first assistant (or any other executive branch attorney exercising the attorney general's core constitutional powers), the commission threatens the attorney general's ability to run his office and therefore represent the State in civil litigation altogether. *Cf. Cofer*, 754 S.W.2d at 124 (noting the utility of the attorney general's ability to "not be personally involved in every case" and to "delegate his duties to his assistants").

In other words, the face of the commission's petition eliminates any *authorized* basis for subjecting the first assistant to discipline and represents an especially egregious invasion of the attorney general's authority. The petition *only* alleges impermissible grounds for discipline— it does *not* allege, for example, that the filing was made in the first assistant's private (and thus unprotected) capacity, or that it constituted criminal (and thus unauthorized and unprotected) conduct, or that it was *ultra vires* (and thus was not action on behalf of the State at all). The first assistant accepts, and so we assume without the need for decision, that the commission would have collateral authority over him under such circumstances, which are not alleged and thus not at issue.

We have not previously needed to distinguish between direct and collateral disciplinary review—but that is because, as far as we can see, this case is the first one we have seen involving collateral review. To date, the commission has provided this Court with no precedents for disciplining *any* public attorney for allegedly violating Rule 8.04(a)(3)

36

based on representations at the pleadings stage. To its credit, in a post-submission letter brief, the commission has acknowledged finding only one other disciplinary matter that relied exclusively on Rule 8.04(a)(3) involving *any* "alleged misrepresentations to a court in pleadings or otherwise." Even that one matter, however, involved a private rather than a public lawyer, and it primarily involved out-of-court conduct rather than statements in judicial filings.

We have found no other such examples ourselves. Our research shows that of 148 instances where a state or federal court has cited Texas Disciplinary Rule of Professional Conduct 8.04, not one provided even a *historical* example of the commission deploying Rule 8.04(a)(3) against an executive-branch attorney for representations made in initial pleadings. This lack of precedent strikes us as unsurprising because the primary way to address alleged violations of disciplinary (and other) rules in initial pleadings is our system's normal way—to take it up with the court to whom the pleadings are presented. Collaterally disciplining an official like the first assistant for statements made in initial pleadings—particularly when a filing involves a politically sensitive lawsuit—creates a serious risk that the judicial branch will venture into, or be dragged into, the contentious arena of political disputes. This Court has time and again refused to do so. *See, e.g.*, *Stetson*, 658 S.W.3d at 297.

It is true that even direct review might impose some such risks, and it is also true that the judiciary does not flinch from performing its task merely because the subject matter might involve controversial topics that courts would gladly avoid. But the theory underlying the commission's case against the first assistant *maximizes* such a risk,

37

including by opening up the process to anyone, anywhere, who for his own reasons—whether good or bad—desires to harness the judicial power of this State and to unleash that power in response to decisions of the executive branch that a complainant opposes. Construing Rule 8.04(a)(3) to bear such a broad application—any accusation of "a lack of honesty, probity, or integrity in principle" or a "lack of straightforwardness"—raises significant separation-of-powers concerns because it is easy to characterize disagreement in such ways when passions rise. The commission, like the judiciary that it serves, instead has the duty to extend to the first assistant—a member of a coordinate branch—a presumption of regularity, good faith, and legality. *See, e.g.*, *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."); *Borgelt v. Austin Firefighters Ass'n*, 692 S.W.3d 288, 303 (Tex. 2024) ("[W]hen courts scrutinize the other branches' actions or enactments, we start with the presumption that the rest of the government, no less than the judiciary, intends to comply with the Constitution.").

Accusations like a "lack of straightforwardness" or "integrity in principle" as bases for subjecting an executive-branch attorney's initial pleadings to collateral review under Rule 8.04(a)(3) are therefore doubly problematic. Such accusations are comparatively vague compared to other disciplinary rules, *e.g.*, Tex. Disciplinary Rules Prof'l Conduct R. 1.11 (providing that "a lawyer shall not represent a private client in connection with a matter in which the lawyer participated personally and

38

substantially as a public officer or employee"), and they constitute as direct an impingement on the presumptions each branch owes to the others as one can imagine. Accordingly, especially in the context of initial pleadings, a minimally narrow rather than a maximally broad reading of Rule 8.04(a)(3) is necessary to avoid undue constitutional friction. And here, although the commission disclaimed any allegation of bad faith at oral argument, its view of Rule 8.04(a)(3) in this case suggests the opposite. By neither giving the first assistant the good-faith presumption nor recognizing the attorney general's authority to determine the arguments and assess the evidence that warrant bringing suit on behalf of the State, the commission's unbounded construction of Rule 8.04(a)(3) forcefully pits the judicial department against the executive.

All that to say, it is insignificant that the commission relabeled the assessments and determinations that informed and populated the initial pleadings as "misrepresentations." Whatever the label, the challenged statements are part and parcel of the attorney general's (and first assistant's) "investigation of the case, and [his] determination" that "the evidence necessary to a successful prosecution of the suit can be procured." *Lewright*, 63 S.W. at 624.

## 3

The court of appeals went a step further. It invoked this Court's admonition that the attorney general, and thus the first assistant, "can only act within the limits of the Texas Constitution *and statutes*." *Del Rio*, 67 S.W.3d at 92 (emphasis added). Seizing on "and statutes," the court of appeals reasoned that "though the Texas Disciplinary Rules of Professional Conduct are not statutory, they 'should be treated like

39

statutes.'" 676 S.W.3d at 698 (quoting *O'Quinn v. State Bar of Tex.*, 763 S.W.2d 397, 399 (Tex. 1988)). It then concluded that the first assistant's constitutional discretion "is plainly limited by adherence to the disciplinary rules." *Id.*

All that is true as far as it goes. The first assistant, for his part, does not dispute that he is bound by the disciplinary rules, which indeed bind all lawyers. But that the first assistant, like all lawyers, is subject to the applicable disciplinary rules does not address how the rules apply in a context laden with constitutional authority or how they are to be enforced if the violation allegedly springs from initial pleadings. We think that the court of appeals got the matter backwards. "The legislature cannot by statute abrogate the Attorney General's constitutional grant of power." *Thomas*, 766 S.W.2d at 219. If the legislature could not by statute abrogate our holdings regarding the attorney general's authority to assess the facts and law incident to filing a case, rules (no matter how much "like statutes" they are) certainly may not do so by authorizing collateral review that the Constitution forbids.

Our decisions in *Cofer*, *Lewright*, and *Stetson* punctuate the point. In *Cofer*, we addressed whether a trial court erred in exercising its inherent powers to preclude the attorney general from "represent[ing] *both* the [Public Utility Commission] *and* a state agency that [was] appealing [the PUC's] decision" on the grounds that his "representation of opposing agencies created a[n] [irreconcilable] conflict of interest." 754 S.W.2d at 122 (emphasis added). After all, under the disciplinary rules, being on both sides of a dispute is impermissible. *See id.*; *see also, e.g.*, Tex. Disciplinary Rules Prof'l Conduct R. 1.06(a) ("A lawyer shall

40

not represent opposing parties to the same litigation."). But there, the attorney general's *statutory* duty trumped the rules—the attorney general could represent the State, even though the State's interests were divided. *Cofer*, 754 S.W.2d at 125. Also at play was an even more fundamental principle: that a disciplinary rule could not "depriv[e] the Attorney General of a power he clearly possesse[d]"—*i.e.*, the constitutional "duty to *represent* the state agencies" and make all the discretionary decisions that representation entails. *See id.*; Tex. Const. art. IV, § 22. The constitutional failsafe, of course, was the court before which the attorney general appeared. *Cofer*, 754 S.W.2d at 125. "[I]n the unlikely event" that the attorney general or his subordinates acted outside their constitutional authority or acted unlawfully, the court could deal with that conduct in due course through direct review. *Id.*

Our decision in *Lewright*, in turn, confirms that even statutory duties cannot trump the attorney general's constitutional authority. There, we rejected an attempt to superintend via statute the attorney general's constitutional discretion. *See Lewright*, 63 S.W. at 623–24. We concluded that we could not issue a writ of mandamus that would have commanded the attorney general "to institute a suit in the name of the [S]tate." *Id.* at 623. True, a statute gave the attorney general the "duty" to "institute a suit" under the circumstances described in the petition, but the People entrusted the attorney general to avoid engaging in "vexatious litigation" or "profitless suits." *See id.* at 623–24. He therefore had broad discretion to "examine into the facts of the alleged offense," find "that there [was] reasonable ground to believe that the statute ha[d] been violated," and conclude "that the evidence necessary to a successful

41

prosecution of the suit c[ould] be procured." *See id.* at 624. Accordingly, the Court refused to "control [the attorney general's] judgment" or to "determine his action." *Id.* Our recent decision in *Stetson* similarly refused to instruct the comptroller regarding how to allocate scarce resources, which—despite a mandatory duty—was a determination for the comptroller to make. 658 S.W.3d at 297.

The commission distinguishes our case law by arguing that these disciplinary proceedings punish the first assistant for past conduct and so do not control his judgment or determine his future action. But our precedents are not so thin. Just like the parties in *Lewright* and *Cofer*, the commission threatens the attorney general's clear constitutional authority and asks the Court to endorse judicial second-guessing of his selection of legal arguments, his assessment of the facts and evidence, and the ultimate decision to file suit based on those determinations. *Cofer*, 754 S.W.2d at 125; *Lewright*, 63 S.W. 623–24. And like in *Stetson*, we cannot fashion a "judicial remedy against the executive branch" where doing so would "interfere in [its] administration of the state government" and "exercise of discretion." 658 S.W.3d at 297. Our decision today adheres to these precedents.

## C

The commission makes one last argument: that finding a lack of subject-matter jurisdiction in this case would not solve, but create, a separation-of-powers problem. According to the commission, the first assistant seeks an "exemption" from the rules governing all other lawyers and thus invades this Court's prerogative to insist that all lawyers—public and private—comply with the rules. Again, however, the first

assistant seeks no such exemption, and we offer none. The commission then relies on out-of-state or federal case law, but those cases ultimately support our holding or are inapposite to the purely collateral proceedings the commission seeks to maintain here. Finally, it argues that the courts and private attorneys are defenseless against executive-branch attorneys who may flout the disciplinary rules without concern for professional liability. We think, however, that the commission's argument overlooks the many existing safeguards against the risk of unscrupulous government lawyers and provides no excuse for the commission's own unprecedented actions.

First—and to reiterate yet again—the first assistant claims no entitlement to violate any disciplinary rule. We authorize no such entitlement, either. All lawyers are bound by the rules. The judiciary remains fully capable of vindicating breaches in any context. In the narrow circumstance before us, however, we conclude that the separation of powers requires that violations of the sort alleged here—based wholly on representations in initial pleadings—must be addressed directly by the court to whom the pleadings are presented rather than on the commission's purely collateral review. The substance and application of the rules remains fully intact, and so does our separation-of-powers precedent.

Second, the commission's invocation of out-of-state authority fares no better. It relies on *Messameno v. Statewide Grievance Committee*, where the Supreme Court of Connecticut rejected the state attorney's extraordinarily broad argument that he could not be disciplined because "*any and all* grievance proceedings pertaining to prosecutors" are "a

43

violation of the separation of powers." 663 A.2d 317, 337 (Conn. 1995) (emphasis added). The state supreme court unsurprisingly rejected such a broad assertion, but it nonetheless observed that "a prosecutor subject to investigation [in a grievance proceeding] may be able to allege that, because of separation of powers principles, different substantive or procedural rules appl[ied] to him or her than to the average attorney." *Id.* at 336. That is because "particular aspects of the prosecutorial function"—including weighing "the strength of the evidence"—are "generally [not] well suited for broad judicial oversight." *Id.* We do not decide today whether even a private lawyer would be subject to the "substantive" rule that the commission advances—but we agree that if so, the attorney general and his lawyers are entitled, "because of separation of powers principles," to a "different . . . procedural rul[e]," *id.*, in the sense that the commission may not collaterally attack initial pleadings made before a court. This principle long predates the Connecticut Supreme Court's, or this Court's, observation. *Cf.* 6 Holdsworth, *supra*, at 468 (noting that the king's attorney was not "subject to [the court's] discipline in the same way as the ordinary attorney").

We again note that the first assistant does not dispute that *a court* can sanction him and other executive-branch lawyers for conduct that occurs before that court and that violates the Texas Disciplinary Rules of Professional Conduct. Without opining on the general correctness of the commission's other cited cases, they do not advance the commission's argument here. *E.g.*, *Chilcutt v. United States*, 4 F.3d 1313, 1327 (5th Cir. 1993) (observing that "to *restrict* a district court's power to fashion appropriate sanctions, simply because the transgressor is a member of

the executive or legislative branch, would violate the separation of powers doctrine" (footnote omitted)). Likewise, our dissenting colleagues have offered no helpful authority. They have not cited a single case involving collateral review of initial filings by the attorney general or his senior officials. Indeed, their cases do not involve scrutiny of the attorney general's conduct at all. *See*, *e.g.*, *post* at 5 & n.9 (quoting *State ex rel. Durden v. Shahan*, 658 S.W.3d 300, 303 (Tex. 2022), which involved assessing the authority of *county attorneys*).

In our view, the commission's attempt to leverage experience in other states only confirms our decision. If there were an established practice of subjecting public lawyers—and especially state attorneys general—to catch-all provisions like Rule 8.04(a)(3) for alleged misrepresentations in initial pleadings, we would expect a host of authorities rather than the silence that we instead find. That silence reflects the judiciary's duty to refuse invitations to interfere with coordinate-branch decisions that are ultimately political. The commission's approach risks allowing the judiciary to be commandeered by adversaries—political or otherwise—who wish to leverage the disciplinary process in service of deeply felt views of policy or politics that are best addressed outside the disciplinary process. "Placing the Constitution's entirely anticipated political arm wrestling into permanent judicial receivership does not do the system a favor." *United States v. Windsor*, 570 U.S. 744, 791 (2013) (Scalia, J., dissenting). While it is of course possible that referrals to the commission could be made cynically or in bad faith, the greater risk may well be complaints that are made in *good* faith—because the complainant genuinely believes in the

45

righteousness of his position. In this case, for example, an out-of-state, inactive Texas attorney believed that "in the middle of a deadly pandemic and economic recession," the first assistant "exacerbated" the Union's "unprecedented loss of life" and "loss of public cohesion" when he "aided and abetted" unnamed "malignant, power-deranged political hacks['] attempt[s] to disenfranchise voters and subvert democracy."

The rule this Court announces today protects the prerogatives of the courts as much as it protects those of the attorney general. "The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted." *INS v. Chadha*, 462 U.S. 919, 951 (1983). By avoiding the temptation to engage in processes that exceed judicial bounds, courts protect their very nature as judicial entities. Our decision applies our well-settled doctrine; it certainly does not fashion a restriction on the judicial branch's inherent power out of whole cloth. *See post* at 8.

Third, we are confident that the normal adversarial system provides a powerful safeguard against executive-branch authorities who may violate the Texas Disciplinary Rules of Professional Conduct over the course of litigation. Once a case has been filed, the opposing party has every incentive—and indeed obligation—to identify *any* problems, ethical or otherwise, with the government's case or its filings. One of our disciplinary rules, for example, provides that a lawyer with "knowledge that another lawyer has committed a [disciplinary rule] violation . . . that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, *shall inform* the appropriate disciplinary authority." Tex. Disciplinary Rules Prof'l Conduct R. 8.03(a)

46

(emphasis added). One such "appropriate disciplinary authority" is unquestionably the court overseeing the conduct that gave rise to the alleged rule violation. And the court does not have to await the opposing party's call; if it perceives breaches of the rules or other sanctionable conduct, the court is empowered to investigate and impose consequences. *See Brewer v. Lennox Hearth Prods., LLC*, 601 S.W.3d 704, 723 n.76 (Tex. 2020).

The exercise of such direct review requires sensitivity to a coordinate branch's authority and entails the presumptions of good faith and regularity that we have repeatedly described. *See supra* pp. 10, 28, 38. But the courts must have the *authority* to subject any attorney's litigation conduct to direct review. Our decision in *Cofer*, for example, confirmed that courts possess such direct-review authority over government attorneys for disciplinary purposes, while acknowledging that *substantive* separation-of-powers concerns could arise there as in any context. 754 S.W.2d at 123. As in *Cofer*, however, "we need not explore [those concerns] here," *id.* at 124, where no direct review has occurred.

While our precedent suggests that a judge "must" refer unethical conduct to disciplinary proceedings, *Brewer*, 601 S.W.3d at 723 n.76, no referral to the commission occurred in this case, and we have no occasion to resolve any dispute concerning the proper extent of such a referral. We note only that a referral to the commission that is preceded by a court's direct observation of a disciplinary-rule violation would be an exercise of the court's inherent powers "to aid in the exercise of its jurisdiction, in the administration of justice, and in preservation of its independence and integrity." *Cofer*, 754 S.W.2d at 124. It is enough to recognize the

distinction between a *referral to* the commission by the presiding court and a commission activated on its own motion or by any party foreign to the litigation forming the basis of a grievance.

Fourth, the first assistant has readily agreed that in other circumstances, the commission—and not just a court—may institute disciplinary procedures. The first assistant cites private representations (such as of family members), actions that constitute criminal conduct (hence the Court's prior acceptance of a former attorney general's resignation in lieu of discipline after he pleaded guilty to federal crimes), or *ultra vires* conduct. Yet again, we have no occasion here to address these or other examples.

Fifth, various political mechanisms serve as additional checks on the attorney general's (and by extension, the first assistant's) conduct. The attorney general's client is ultimately the People of the State, who are empowered to renew his engagement, or not, every four years. As then-Justice Willett observed, it is this electoral process that prescribes the strongest medicine for "an obdurate and vengeful Attorney General Javert." *City of Galveston v. State*, 217 S.W.3d 466, 481 (Tex. 2007) (Willett, J., dissenting). The legislature, moreover, possesses powers for expressing its disapproval of the attorney general's conduct. Its devices include how his office is funded or regulated; or, if necessary, by formal censure as provided by the Constitution.

Finally, in addition to the other checks on executive-branch violations of our rules, this Court's inherent power to discipline (or even disbar) public and private attorneys alike remains the ultimate failsafe. *See Scott*, 24 S.W. at 790; *Cofer*, 754 S.W.2d at 125. After all, as part of

48

its inherent authority, the judiciary policed professional misconduct in litigation long before the commission was created. *See supra* Part II.B.1; *Dillon*, 6 Tex. at 58–59. That inherent authority remains intact today.

This Court, moreover, will remain the final check if courts improperly impose or, in egregious cases, refuse to impose discipline. *See Jackson*, 21 Tex. at 672–73. The worthy goal of the State Bar Act and its many revisions is to streamline and systematize the disciplinary system such that resort to the courts' inherent authority becomes less and less necessary. But the authority itself remains. The judicial branch, and this Court, remain fully capable of redressing whatever concerns may arise that would otherwise threaten the independence, integrity, or impartiality of the judiciary. Vindicating our power to "regulate the practice of law in Texas for the benefit and protection of the justice system and the people as a whole," *Nolo Press*, 991 S.W.2d at 769, does not depend on allowing the commission to bring lawsuits like the one it initiated here.

## IV

Because we conclude that the commission's case is nonjusticiable under the separation-of-powers doctrine, we do not reach the first assistant's alternative sovereign-immunity argument. The court of appeals' judgment is reversed. We reinstate the trial court's judgment dismissing the case for lack of subject-matter jurisdiction.

Evan A. Young
Justice

**OPINION DELIVERED:** December 31, 2024